UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>BORUSAN MANNESMANN PIPE<br>U.S. INC., ET AL., )<br><br>Defendant-<br>Intervenors. ) | Court No. 22-00338 |

ORDER

Upon consideration of the Rule 56.2 Motion of Plaintiff SeAH Steel Corporation ("SeAH") for Judgment on the Agency Record, all responses thereto, and all other relevant record information, it is hereby

ORDERED that SeAH's Rule 56.2 Motion for Judgment on the Agency Record is granted; and it is further

ORDERED that the final determination by the U.S. Department of Commerce ("Commerce"), as set forth in *Oil Country Tubular Goods from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 59056 (September 29, 2022) is reversed and remanded for disposition in a manner consistent with the judgment of this Court.

Signed: _____
Mark A. Barnett, Chief Judge

Dated: _____
New York, NY

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION, ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | Court No. 22-00338 |
| ) | |
| and ) | |
| ) | |
| BORUSAN MANNESMANN PIPE ) | |
| U.S. INC., ET AL., ) | |
| ) | |
| Defendant- ) | |
| Intervenors. ) | |
| ) | |

MOTION OF PLAINTIFF SEAH STEEL CORPORATION
FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff

SeAH Steel Corporation ("SeAH") hereby moves for judgment on the agency record in the

above-referenced action.  For the reasons set forth in SeAH's Brief in Support of Its Rule

56.2 Motion for Judgment on the Agency Record, SeAH requests that the Court hold that

the final determination by the U.S. Department of Commerce ("Commerce"), as set forth

in as set forth in *Oil Country Tubular Goods from the Republic of Korea: Final Affirmative

Countervailing Duty Determination*, 87 Fed. Reg. 59056 (September 29, 2022), is not

supported by substantial evidence on the record and is not otherwise in accordance with the

law, and that the Court therefore remand this matter to Commerce for disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Amrietha Nellan
Jooyoun Jeong

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20036
(202) 774-5500

Attorney for SeAH Steel Corporation

March 17, 2023

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>BORUSAN MANNESMANN PIPE )<br>U.S. INC., ET AL., )<br><br>Defendant-<br>Intervenors. ) | Court No. 22-00338 |

BRIEF OF SEAH STEEL CORPORATION IN SUPPORT OF
ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

PUBLIC VERSION

PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER DELETED FROM PAGES 27, 41, 44, 46

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

March 17, 2023

Table of Contents

Page

STATEMENT PURSUANT TO RULE 56.2(C)(1) ..............................................................2

   A.   Administrative Determination under Review ...........................................2

   B.   Issues of Law and Summary of Reasons for  Reversing Commerce's Determination ............................................................................................2

STATEMENT OF FACTS .......................................................................................5

   A.   Initiation of Investigation .........................................................................7

   B.   Initial Questionnaire .................................................................................7

   C.   Supplemental Questionnaires .................................................................10

   D.   Preliminary and Post-Preliminary Determination .................................11

   E.   Verification ............................................................................................12

   F.   Verification Report .................................................................................15

   G.   Briefing ..................................................................................................16

   H.   Final Determination ...............................................................................18

ARGUMENT ...................................................................................................19

   A.   Commerce's Decision to Reject Information Presented by SeAH at Verification and Instead to Base Its Determination on Adverse Facts Available Was Unsupported by the Evidence and Contrary to Law ................19

       1.   There Is No Evidence on the Record to Support Commerce's Finding that SeAH Received a Performance Guarantee from KEXIM during the Relevant Period ..................................19

       2.   SeAH Was Not Instructed or Required to Report KEXIM Performance Guarantees Received Prior to the Calendar-Year 2020 Investigation Period .........................................21

       3.   The Information Presented by SeAH at Verification to Demonstrate that It Had Not Received KEXIM Performance Guarantees during the Calendar-Year 2020 Investigation Period Was Specifically Requested by Commerce, Is Properly Part of the Record, and Cannot Be Disregarded as Untimely New Factual Information ..................................23

Page

    4.    The Information Included in SeAH's Case and Rebuttal
            Briefs that Commerce Rejected Simply Described What Had
            Occurred at Verification and Was Not "New" Information ........................ 27

B.    Commerce Decision to Apply Adverse Facts
      Available for the KEXIM Performance Guarantee
      Was Unlawful and Unsupported by the Evidence ................................................ 30

    1.    Commerce May Not Resort to Facts Available
            When it Failed to Request the Information .................................................. 31

    2.    SeAH Was Not Required to Report the 2019 KEXIM
            Performance Guarantee as an "Other" Subsidy ........................................... 34

C.    The Record Evidence Does Not Support Commerce's
      Conclusion that the Performance Guarantee
      Obtained by SeAH in 2019 Constituted a Counter-
      vailable Subsidy during the Investigation Period ................................................ 37

    1.    The Evidence Presented at Verification Confirms
            that the KEXIM Performance Guarantee Had
            Been Received by SeAH in 2019, not 2020 ................................................ 37

    2.    The Evidence Presented at Verification Demonstrates
            that the KEXIM Performance Guarantee Did Not
            Benefit SeAH's Exports of OCTG to the United States ............................. 39

    3.    The Evidence Presented at Verification
            Demonstrates that Any Benefit from the KEXIM
            Performance Guarantee was De Minimis ..................................................... 40

    4.    Commerce's Claim that SeAH Had Not Been Fully
            Cooperative, and that a Punitive Rate Should
            Therefore Be Applied, Is Contrary to the Evidence .................................... 43

    5.    The Punitive Subsidy Rate Applied by Commerce
            as Adverse Facts Available for the KEXIM
            Performance Guarantee Was Not Corroborated ........................................... 44

CONCLUSION ................................................................................................................. 46

ATTACHMENT

Statement of Sang-Wook Kim (March 17, 2023)

Table of Authorities

Page

C OURT D ECISIONS

*Bosun Tools Co. v. United States,*
   405 F. Supp. 3d 1359 (CIT 2019) .......................................................................... 24, 28

*Changzhou Trina Solar Energy Co. v. United States,*
   195 F. Supp. 3d 1334 (CIT 2016) .......................................................................... 36

*CITIC Trading Co. v. United States,*
   27 C.I.T. 356 (2003) ............................................................................................... 25, 27

*F. Lli De Cecco Di Filippo Fara San*
   *Martino S.P.A. v. United States,*
   980 F. Supp. 485 (CIT 1997) ................................................................................. 30

*Guizhou Tyre Co. v. United States,*
   523 F. Supp. 3d 1312 (CIT 2021) .......................................................................... 36

*Hyundai Electric & Energy Systems v. United States,*
   477 F.Supp.3d 1324 (CIT 2020) ............................................................................ 29

*Jindal Poly Films Ltd. of India v. United States,*
   365 F. Supp. 3d 1379 (CIT 2019) .......................................................................... 22, 32, 37

*Maverick Tube Corp. v. United States,*
   857 F.3d 1353 (Fed. Cir. 2017) ............................................................................. 34

*NSK LTD. v. United States,*
   481 F. 3d 1355 (Fed. Cir. 2007) ............................................................................ 34

*POSCO v. United States,*
   353 F. Supp. 3d 1357 (CIT 2018). ......................................................................... 39

*Queen's Flowers de Colombia v. United States,*
   981 F.Supp. 617 (CIT 1997) .................................................................................. 22, 32, 37

*Saha Thai Steel Pipe Co. v. United States,*
   661 F.Supp. 1198 (1987) ........................................................................................ 29

*Shenzhen Xinboda Indus. Co. v. United States,*
   279 F. Supp. 3d 1265 (CIT 2017) .......................................................................... 42

*Ta Chen Stainless Steel Pipe v. United States,*
   23 C.I.T. 804 (1999) ............................................................................................... 32

Page

*TMK IPSCO v. United States*,
   179 F. Supp. 3d 1328 (CIT 2016) ................................................................. 25

STATUTES AND REGULATIONS

19 C.F.R. § 351.308(d) ................................................................................................ 45

19 C.F.R. § 351.524(a) ................................................................................................ 40

19 C.F.R. § 351.524(b)(1)-(2) ................................................................................ 39, 40

19 U.S.C. § 1516a(b)(2)(A)(i) ................................................................... 28, 29, 30, 44

19 U.S.C. § 1677e(a) ................................................................................................... 32

19 U.S.C. § 1677e(b)(1) .............................................................................................. 44

19 U.S.C. § 1677e(c) ................................................................................................... 46

19 U.S.C. § 1677m(d). ......................................................................................... 31, 32

ADMINISTRATIVE DETERMINATIONS

*Certain Collated Steel Staples from the People's Republic of China:*
   *Final Affirmative Countervailing Duty Determination and*
   *Final Affirmative Critical Circumstances Determination*,
   85 Fed. Reg. 33626 ............................................................................................... 35

*Final Affirmative Countervailing Duty Determination:*
   *Steel Wire Rod from Germany*,
   62 Fed. Reg. 54990 (Oct. 22, 1997) .................................................................... 42

*Final Affirmative Countervailing Duty Determination;*
   *Oil Country Tubular Goods from Spain*,
   49 Fed. Reg. 47060 (Nov. 30, 1994) .................................................................... 37

PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE MARK A. BARNETT, CHIEF JUDGE

| | | |
|---|---|---|
| SeAH STEEL CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | Court No. 22-00338 |
| | ) | |
| and | ) | |
| | ) | |
| BORUSAN MANNESMANN PIPE | ) | |
| U.S. INC., ET AL., | ) | |
| | ) | |
| Defendant- | ) | |
| Intervenors. | ) | |
| | ) | |

BRIEF OF SeAH STEEL CORPORATION IN SUPPORT OF
ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

This brief is submitted on behalf of SeAH Steel Corporation ("SeAH") to contest the

final determination by the U.S. Department of Commerce ("Commerce") in the

countervailing duty investigation on Oil Country Tubular Goods ("OCTG") from Korea.

PUBLIC VERSION

<u>STATEMENT PURSUANT TO RULE 56.2(C)(1)</u>

A.  *Administrative Determination under Review*

Commerce's notice of the final determination with respect to SeAH was published in the Federal Register on September 29, 2022.[1]  Commerce's discussion of the issues raised in the final results was set forth in a separate memorandum dated September 23, 2022.[2]

B.  *Issues of Law and Summary of Reasons for Reversing Commerce's Determination*

1.  *Whether Commerce May Properly Reject Information Presented at Verification in Response to a Specific Request from Commerce as New Factual Information?*

Commerce's initial questionnaire in this case requested that SeAH provide information on performance guarantees received from the Korean Export-Import Bank ("KEXIM") during the calendar-year 2020 investigation period.  SeAH accurately responded that it had not received such guarantees during 2020.

Commerce's verification agenda instructed SeAH to prepare documentation demonstrating, *inter alia,* the accuracy of its statement that it had not received a KEXIM performance guarantee during the investigation period.  SeAH did so.  At verification, SeAH presented a package demonstrating that it had received a guarantee from KEXIM in 2019, which remained on SeAH's books during 2020, but that SeAH had not received any guarantee from KEXIM in 2020 (just as SeAH had reported).

---

[1] *See Oil Country Tubular Goods from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 59056 (September 29, 2022) (hereinafter "Final Determination") (Public Record ("PR") 382).

[2] *See* Issues and Decision Memorandum for the Final Determination of the Countervailing Duty Investigation of Oil Country Tubular Goods from the Republic of Korea (September 23, 2022) (hereinafter "I&D Memo") (PR-377).

Commerce took the position, however, that the documentation presented by SeAH at verification constituted untimely "new" factual information, and that SeAH's statements at verification established that SeAH had failed in its initial response to report information that Commerce had requested concerning the KEXIM Performance Guarantee program. As a result, Commerce applied adverse facts available to SeAH in its final determination. In the absence of this application of adverse facts available, Commerce's final determination would have found that the subsidy rate for SeAH was *de minimis.*

It is clear, however, that Commerce was not permitted to exclude the materials submitted by SeAH at verification from the record.  To begin with, the statute provides that the record includes all "information presented to or obtained by the Secretary, the administering authority, or the Commission during the course of the administrative proceeding."  The materials presented by SeAH at verification were presented to Commerce (and reviewed by the verifiers) in response to Commerce's explicit request, in order to demonstrate the accuracy of the statement in SeAH's initial response that it had not received any KEXIM performance guarantees during the calendar-year 2020 investigation period.  The purpose of verification is to demonstrate the accuracy of previously-submitted information.  Commerce cannot properly refuse to allow a respondent the opportunity to make such a demonstration, and then penalize the respondent for allegedly failing to prove the accuracy of its previous statements.

    2.    *Whether Commerce May Properly Apply Adverse Facts Available Due to a Respondents' Failure to Provide Information that Was Never Requested by Commerce?*

Commerce's initial questionnaire in this case directed SeAH to provide information on KEXIM performance guarantees received during the calendar-year 2020 investigation

period.  SeAH's response to that questionnaire correctly stated that SeAH had not received KEXIM performance guarantees during that period.

In its final determination, Commerce decided to apply adverse facts available to SeAH because SeAH had not reported a KEXIM performance guarantee received in 2019. But Commerce is not permitted to penalize a respondent for not submitting information that Commerce never requested.  Because Commerce only requested information on KEXIM performance guarantees received during the calendar-year 2020 investigation period, it cannot properly punish SeAH for failing to report a guarantee received during an earlier period.

> 3. *Whether the Evidence in this Case Supports Commerce's Determination that the Performance Guarantee that SeAH Received from KEXIM in 2019 in Conjunction with a Sale of a Non-Subject Product to Canada Constituted a Subsidy for OCTG during the Calendar-Year 2020 Investigation Period?*

The documentation presented by SeAH at verification confirmed that the KEXIM performance guarantee had been received by SeAH in 2019, not 2020.  That documentation also demonstrated that the guarantee was obtained in connection with a sale of a non-subject product to a Canadian customer, and that it did not benefit SeAH's sales of OCTG in any market.  In addition, the documentation presented at verification also demonstrated that the benefit of any subsidy from the performance guarantee would have been *de minimis*.

Commerce took the position that it was permitted to ignore the documentation presented by SeAH at verification when determining whether or not the KEXIM performance guarantee constituted a countervailable subsidy.  But that position is clearly incorrect.  The documentation presented at verification was specifically requested by Commerce's verification agenda and was presented for the purpose of demonstrating the

accuracy of SeAH's previous statement that it had not received any KEXIM performance guarantee during the investigation period. And, because the materials presented at verification were admissible for that purpose, they can also be used to determine whether the guarantee that SeAH received in 2019 constituted a countervailable subsidy.

Commerce also asserted that punitive "adverse facts available" were appropriate because SeAH had allegedly failed to cooperate fully with Commerce's investigation. But that claim has no merit. SeAH fully cooperated with Commerce's investigation by answering the questions that Commerce posed in its questionnaires. SeAH's failure to provide information on the guarantee received in 2019 prior to verification did not reflect a lack of cooperation. Instead, it was solely the result of Commerce's failure to request that information. Commerce cannot properly punish a respondent for failing to anticipate that Commerce will later decide that it needs information that it never requested.

Finally, even if Commerce were permitted to apply adverse facts available, it still is required by statute to corroborate the information used to the extent practicable. In this case, Commerce stated that it could not corroborate the punitive rate it applied to SeAH because it had never previously examined the KEXIM Performance Guarantee program. But the statute does not limit corroboration to a review of past decisions. In this case, there was ample evidence that was readily available to Commerce that demonstrated the punitive rate applied by Commerce did not reasonably reflect the actual benefit of the KEXIM performance guarantee that SeAH had received in 2019. Commerce's failure to consider that evidence cannot be sustained.

## STATEMENT OF FACTS

The information submitted by SeAH in this case demonstrated that any subsidies received by SeAH in connection with its production and sales of OCTG were well below

PUBLIC VERSION

the one percent *de minimis* threshold established by statute.  Indeed, after reviewing SeAH's submissions, Commerce made a negative preliminary determination of subsidies with respect to SeAH.  In its final determination, however, Commerce chose to create an affirmative subsidy determination for SeAH based on the application of adverse facts available.  In particular, Commerce's final determination asserted that certain information presented by SeAH at verification constituted both untimely "new" factual information *and* an admission by SeAH that it had failed to report information (concerning a KEXIM performance guarantee received in 2019) that had been explicitly requested by Commerce's initial questionnaire.

As discussed more fully below, both of those findings are false:  In reality, Commerce's questionnaires had only requested information about KEXIM performance guarantees received during the calendar-year 2020 investigation period, and not about guarantees received during prior periods.  SeAH's initial questionnaire response correctly reported that it had not received KEXIM performance guarantees during the calendar-year 2020 investigation period.  The information presented by SeAH at verification concerning the KEXIM performance guarantees had been explicitly requested by Commerce's verification agenda.  That information did not disclose the existence of a previously unreported KEXIM performance guarantee during the calendar-year 2020 investigation period.  Instead, the information presented by SeAH at verification confirmed the accuracy of SeAH's previous response that it had not received such guarantees during 2020.  In short, Commerce's decision to apply adverse facts available reflected a gross misrepresentation of the record.

A.   *Initiation of Investigation*

The initial petition on OCTG from Korea filed by domestic interested parties alleged, *inter alia*, that performance guarantees provided by KEXIM to Korean companies constituted a countervailable subsidy.  Commerce evaluated the programs included in the petition and released its analysis in its October 26, 2021, Initiation Checklist.  In its Initiation Checklist, Commerce stated that it recommended initiating an investigation into various programs, including the KEXIM Performance Guarantee program, as described in the petition.[3]

B.   *Initial Questionnaire*

Commerce selected SeAH as one of the mandatory respondents for the investigation.[4]  On November 24, 2021, Commerce issued its initial questionnaire to SeAH.[5]  The "General Instruction" of the questionnaire stated that the "response to the questionnaire should include all information requested."[6]  The questionnaire further stated that SeAH was required to respond to Section III of that questionnaire and that the period of investigation (or "POI") was from January 1, 2020, through December 31, 2020.[7]

The questionnaire also clarified that the reporting requirements differed for "recurring" and "non-recurring" subsidy programs.  For "recurring" programs, respondents

---

[3] *See* Commerce's October 26, 2021, Initiation Checklist (PR-116, CR-85).

[4] Memorandum from J. Maeder, re: *Countervailing Duty Investigation of Oil Country Tubular Goods from the Republic of Korea: Respondent Selection* (November 22, 2021) (PR-127, CR-88).

[5] *See* Commerce's November 24, 2021, Initial Questionnaire (hereinafter "Initial Questionnaire") (PR-129).

[6] *Id.*, Section I at 1.

[7] *Id.*

were required only to report information on subsidies during the investigation period —

that is, during calendar-year 2020.[8]  By contrast, for "non-recurring" programs,

respondents were required to report information for a 15-year period consisting of the 2020

calendar year and the 14 previous years.[9]  This extended reporting period for "non-

recurring" subsidies was referred to in the questionnaire as the "average-useful-life"

period.[10]

Section III of the questionnaire asked for information about the company and its use

of specific programs.  For the KEXIM Performance Guarantee program, Commerce asked

only for information about guarantees received during the investigation period:

> 6.   KEXIM Performance Guarantees
>
> Respond to all questions in the Standard Questions Appendix and
> the Loan Benchmark and Loan Guarantee Appendix. Complete the
> Loan Template and include it as an attachment to your response in
> electronic format using Microsoft Excel. Your response should provide
> details regarding all assistance that your company *received* under this
> program *during the POI*.[11]

The limitation of this request to guarantees received during the investigation period was

consistent with Commerce's request for information for other recurring programs

identified in the questionnaire.[12]  By contrast, when Commerce requested information

---

[8] *See, e.g.*, *id.*, Section II at 24, 25, Section III at 22 (PR-129).

[9] *Id.*

[10] *See., e.g.*, *id.* at 6.

[11] *See id.* at 8 (PR-129).

[12] *See id.* at 14 (only asking for the amount "received" during the investigation period for
the K-Sure Export Credit Guarantee program).

PUBLIC VERSION

about subsidized loans received prior to the investigation period that remained outstanding during the period, the request was made explicit in the questionnaire.[13]

SeAH had not received any guarantees from KEXIM during 2020.  However, it had received a guarantee under the KEXIM Performance Guarantee program in 2019.  This guarantee related to a sale in 2019 of non-subject pipe to a Canadian customer, under which SeAH was obligated to deliver the pipe to the customer during 2019 and 2020.  The guarantee received from KEXIM in 2019 provided that, if SeAH failed to satisfy its obligations to the Canadian customer under the terms of its sales agreement, KEXIM (as the guarantor) would make a payment to SeAH's customer up to the amount specified in the agreement.

As discussed above, the questionnaire only requested information about KEXIM performance guarantees received by SeAH during the calendar-year 2020 investigation period.  Because the guarantee that SeAH received from KEXIM in 2019 was not received during the calendar-year 2020 investigation period, and because SeAH had not received any guarantees from KEXIM during 2020, SeAH's response to Commerce's initial questionnaire correctly stated that SeAH had not received any performance guarantees from KEXIM during the investigation period.[14]

---

[13] Thus, for loan programs, the questionnaire stated that the "response should provide details regarding all … loans provided to your company, or outstanding, during the POI whether in the form of loans, negotiation fees, etc." *See, e.g.,* Initial Questionnaire, Section III at 9 (requesting information for KDB's Short-Term Discounted Loans for Export Receivables); *id.,* at 10 (requesting information for KDB Funding of Industrial Restructuring Loans); *id.,* at 12 (requesting information for KDB General Operating Financing Loans); *id.,* at 16 (requesting information for Assistance and Financial Support for New Convergence Industries and Manufacturers Loans) (PR-129).

[14] SeAH responded to the questionnaire both on behalf of itself and on behalf of its parent SeAH Steel Holding Corporation ("SSHC").  SeAH's response stated that SSHC also had

*(footnote continued on following page)*

C.  *Supplemental Questionnaires*

Commerce issued one supplemental questionnaire regarding SeAH's response to Section III of the initial questionnaire on February 16, 2022, nearly two months after SeAH's initial questionnaire response and less than one month before the preliminary determination.[15]

That supplemental questionnaire did not ask for any additional information on the KEXIM Performance Guarantee program.[16]  Commerce, however, did ask for additional information for certain grant programs for which Commerce's initial questionnaire had only asked SeAH to report assistance received under certain grant programs during the investigation period.[17]  In its supplemental questionnaire, Commerce clarified that it also needed information on any assistance received under those grant programs during the average-useful-life period and asked SeAH to provide that information (which SeAH provided).[18]

_____

*(footnote continued from previous page)*
not received any guarantees under the KEXIM Performance Guarantee program during the investigation period.

[15] *See* Commerce's February 16, 2022, Supplemental Questionnaire (hereinafter "First Supplemental Questionnaire") (PR-249, CR-209).

[16] *See id.*

[17] *See id.* at 2.

[18] Thus, Commerce's supplemental questionnaire included the following question:

> You state in response to several grant programs in your initial questionnaire response that "{n}either SeAH {Steel Corporation} nor SSHC entered into an agreement … or benefited … during the investigation," or that "{n}either SeAH {Steel Corporation} nor SSHC applied for or received grants … during the investigation period.
>
> Confirm that SeAH Steel Corporation, both the current and former entities, and SSHC neither were approved for nor received any

*(footnote continued on following page)*

Commerce then issued a second supplemental questionnaire regarding SeAH's Section III response on May 2, 2022 —nearly two months *after* the preliminary determination.[19]  Once again, that supplemental questionnaire did not ask for any additional information on the KEXIM Performance Guarantee program.[20]

### D. *Preliminary and Post-Preliminary Determination*

On March 14, 2022, Commerce issued a preliminary negative countervailing duty determination.[21]  On June 29, 2022, Commerce issued a post-preliminary analysis addressing certain new subsidy allegations made by domestic interested parties that had not been addressed in its preliminary determination.[22]  There was no change to Commerce's preliminary determination that SeAH did not use the KEXIM Performance Guarantee program during the investigation period.[23]  And Commerce determined that,

---

*(footnote continued from previous page)*
> undisclosed grants from the Government of Korea (GOK) under any programs during the AUL period. If any previously undisclosed grants were received by SeAH Steel Corporation, current or former, or SSHC, report those grants now and respond to all questions in the Standard Questions Appendix and the Grants and Allocation Appendix included in the initial questionnaire.

*Id*. (editorial insertion in original).

[19] *See* Commerce's May 5, 2022, Second New Subsidy Allegations Questionnaire (PR-295).

[20] *See id.*

[21] *See Oil Country Tubular Goods from the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 87 Fed. Reg. 14248 (March 14, 2022) (PR-284).

[22] *See* Memorandum from A. Caton, *re: Post-Preliminary Determination Calculations for SeAH Steel Corporation* (June 29, 2022) (PR-313, CR-243-44).

[23] *See id.*

even after considering the new subsidy allegations, SeAH's subsidy rate remained *de minimis*.[24]

### E.   Verification

Commerce conducted an on-site verification of SeAH from August 22 to 25, 2022. The "agenda" issued by Commerce for the verification stated that SeAH should "provide all appropriate source records to substantiate the completeness and accuracy of the information in the responses, including ... non-use of programs," and specifically asked SeAH to demonstrate "non-use" of the KEXIM Performance Guarantee program.[25] The verification agenda also stated that to verify "non-use," Commerce would examine all notes to SeAH's audited financial statements for the investigation period (*i.e.*, the 2020 calendar year) and the prior fourteen years corresponding with the average-useful-life period (*i.e.*, the 2005-2019 calendar years).[26]

SeAH prepared a package on "non-use" that was presented to Commerce officials on the third day of verification.[27] That package addressed all of the programs identified in the petition that SeAH had not received during the relevant time period.[28] Through references to normal company documents, accounting records, and financial statements, the package

---

[24] *See id.* at 1.

[25] *See* Verification of SeAH Steel Corporation's Questionnaire Responses, Verification Agenda (August 8, 2022) (hereinafter "SeAH Verification Agenda") at 1 (PR-332).

[26] *See id.* at 9.

[27] *See* SeAH's September 8, 2022, Rejected Case Brief, Attachment 2, Statement of Sang-Wook Kim at 2-5 (hereinafter "Statement of Sang-Wook Kim") (PR-353, CR-273).

[28] *See id.*

confirmed that SeAH had not received any of the "non-use" programs (including the

KEXIM Performance Guarantee program) during the relevant periods.[29]

To demonstrate "non-use" of the KEXIM Performance Guarantee program (and other

guarantees), the package presented by SeAH included a copy of a document maintained by

SeAH in the normal course of business that listed all liabilities and guarantees for its 2019

and 2020 fiscal years.[30]  The total amounts of liabilities and guarantees identified in that

document were then tied to SeAH's audited financial statements for its 2019 and 2020

fiscal years, with copies of the relevant pages of the financial statements included in the

package.[31]  Finally, the package also included copies of both the performance guarantee

contract and the underlying sales agreement that had required SeAH to obtain the

performance guarantee.[32]

Those documents confirmed that the guarantee was not used during the investigation

period.  They demonstrated that SeAH received the guarantee in 2019, that the guarantee

was tied to a particular export of stainless steel pipe to Canada, and that the guarantee was

due to remain in effect until the end of 2020, because the underlying sales contract required

performance by SeAH during 2020 as well as 2019.[33]  Furthermore, the information

presented in the "non-use" package, including SeAH's 2019 financial statement, identified

the total amount guaranteed by the performance guarantee.[34]  Significantly, even if the

---

[29] *See id.*

[30] *See id.*

[31] *See id.*

[32] *See id.*

[33] *See id.*, Exhibit 1 at 6-9.

[34] *See id.*

total amount guaranteed had been considered a subsidy and allocated over SeAH's sales during the year in which the guarantee was received, the resulting benefit would have been less than 0.5 percent.

The day after SeAH presented the "non-use" package, the Commerce officials conducting the verification requested further information on the performance guarantee.[35] Specifically, Commerce officials asked SeAH to provide information on when payments to KEXIM were made, and whether KEXIM had made any payments to SeAH or to SeAH's customer under the guarantee.[36]  In response, SeAH provided information demonstrating that SeAH had made payments to KEXIM in 2019 and 2020 and that KEXIM made no payments to SeAH or to SeAH's customer under the guarantee.[37]  Furthermore, the information presented in response to Commerce's request confirmed that the guarantee SeAH had obtained from KEXIM in 2019 related to a sales contract to a non-subject third-country customer for non-subject merchandise.[38]

After SeAH provided the information requested by the Commerce officials, the Commerce officials conducting the verification informed SeAH and its counsel that they had consulted with other Commerce officials and concluded that all of the information concerning the KEXIM performance guarantee constituted untimely "new factual

---

[35] *See id.* at 6.

[36] *See id.*

[37] *See id.*

[38] *See id.*

information."[39]  As a result, the Commerce verifiers removed those materials from the documents retained as the official verification exhibits.

After informing SeAH of this decision, the Commerce official who was primarily responsible for the verification of this issue discussed with SeAH and its counsel how he intended to write-up the issue in the verification report.[40]  As a courtesy, he read aloud the draft of the discussion of the KEXIM performance guarantee.[41]  His draft explicitly mentioned, *inter alia*, the amount of the guarantee, as identified in SeAH's 2019 financial statements.[42]

### F.   Verification Report

On September 1, 2022, Commerce issued its verification report for SeAH.[43]  In that report, Commerce stated that, although Commerce had asked for information about the KEXIM Performance Guarantee program in the initial questionnaire, SeAH had failed to provide the requested information in its response to that questionnaire.[44]  The verification report also stated that the information presented at verification demonstrating "non-use" of

---

[39] *See id.*

[40] A sworn statement by the accountant that prepared and presented the package on non-use to the verifiers that describes the discussion with the verifiers after the materials were presented and what information would be included in the agency's report is set forth in the Attachment to this brief.

[41] *See* Attachment.

[42] *See id.*

[43] *See* September 1, 2022, SeAH Verification Report (PR-345, CR-265) (hereinafter "Verification Report").

[44] *See id.* at 9-10.

that program was properly excluded from the verification exhibits as "new factual information."[45]

Significantly, the final version of the verification report did not include the amount of the guarantee.  In other words, Commerce made a decision after the verification to modify the report drafted by the Commerce official who actually conducted the verification of this issue.

### G.   Briefing

In its case brief filed on September 8, 2022, SeAH argued, *inter alia*, that Commerce's decision to reject the information presented at verification regarding the KEXIM Performance Guarantee program as "new factual information" was improper and inconsistent with the instructions set forth in the verification agenda; that Commerce's description in its verification report of the information presented at verification regarding the KEXIM Performance Guarantee program was incomplete and erroneous; and that, if the KEXIM Performance Guarantee program was to be considered a subsidy during the relevant period, the subsidy benefit had to be calculated based on the value of the guarantee identified in SeAH's 2019 financial statements that were provided to Commerce officials during verification.[46]  In support of these arguments, SeAH provided a copy of the original "non-use" package that was presented to Commerce officials during verification and a notarized affidavit from the accountant who had presented the materials at verification describing what had happened during verification.[47]

---

[45] *See id.*

[46] *See* SeAH's September 8, 2022, Rejected Case Brief at 22-35 (PR-353, CR-273).

[47] *See id.* at Attachment 2.

On September 9, 2022, Commerce rejected SeAH's case brief on the grounds that the discussion of the information presented to Commerce officials at verification constituted untimely "new factual information."[48]  Commerce requested that SeAH file a redacted case brief by September 12.[49]  SeAH filed comments objecting to Commerce's rejection of its case brief on September 10.[50]  Because Commerce had not responded to SeAH's objection, SeAH filed a redacted case brief on September 12.[51]

On September 13, Commerce revised its decision, concluding that much of the information it had previously instructed SeAH to redact from its September 8 case brief was not "new factual information."[52]  Accordingly, Commerce asked SeAH to file a second redacted case brief that only redacted the attachment to SeAH's case brief, which contained the original verification package for the KEXIM Performance Guarantee program and the accountant's affidavit, and all references within the case brief to those materials.[53]  In accordance with those instructions, SeAH filed a second redacted case brief on September 13, 2022.[54]  Because Commerce's revised instructions did not instruct SeAH

---

[48] *See* Letter from R. Janz to J. Winton, September 9, 2022 (PR-357).

[49] *See id.*

[50] *See* SeAH's September 10, 2022, Objection to Department's Rejection of SeAH's September 8, 2022, Case Brief (PR-359).

[51] *See* SeAH's September 12, 2022, Redacted Case Brief (PR-360, CR-277).

[52] *See* Letter from R. Janz to J. Winton, September 13, 2022 (PR-363).

[53] *See id.*

[54] *See* SeAH's September 13, 2022, Second Redacted Case Brief (PR-365, CR-278).

to remove the amount of the guarantee from its case brief, the second redacted case brief included statements regarding the amount of that guarantee.[55]

On September 16, 2022, domestic interested parties filed a letter claiming that the value of the KEXIM performance guarantee was "new factual information," and requested that Commerce strike all references to that figure and related arguments from SeAH's second redacted case brief and rebuttal brief.[56]  SeAH filed comments objecting to Petitioner's request on September 19.[57]  The same day, Commerce granted Petitioner's request in part, and instructed SeAH to redact from its case and rebuttal briefs all references to the value of the guarantee.[58]  On September 20, SeAH filed a third redacted case brief and a redacted rebuttal brief in accordance with Commerce's instructions.[59]

## H.   Final Determination

On September 29, 2022, Commerce issued a final affirmative determination in which it applied adverse facts available for the KEXIM Performance Guarantee program and resulted in a 1.33 percent ad valorem subsidy for SeAH.[60]  In reaching its decision, Commerce stated that it was applying adverse facts available for the KEXIM Performance Guarantee program, because SeAH had been obligated to provide information on the 2019

---

[55] *See id.* at 34.

[56] *See* Domestic Interested Parties' September 16, 2022, Comments on Untimely New Factual Information Included in Briefs (PR-370).

[57] *See* SeAH's September 19, 2022, Response to Petitioners' September 16, 2022, Letter (PR-371).

[58] Letter from R. Janz to J. Winton, September 19, 2022 (PR-372, CR-281).

[59] *See* SeAH's September 20, 2022, Third Redacted Case Brief (PR-374, CR-282); SeAH's September 20, 2022, Redacted Rebuttal Brief (PR-375, CR-283).

[60] *See* Final Determination (PR-382) and I&D Memo (PR-377).

guarantee it had received from KEXIM in response to the initial questionnaire's question about the KEXIM Performance Guarantee program, and, alternatively, to the questionnaire's "other subsidies" question .[61]  In that regard, Commerce asserted that SeAH failed to report "*requested* necessary information" that significantly impeded the proceeding by "replacing its discretion for that of Commerce" preventing Commerce from fully investigating the KEXIM Performance Guarantee program.[62]  Furthermore, Commerce stated that it was SeAH's responsibility to seek clarification from the agency regarding what information was required in response to the questionnaire's question about KEXIM Performance Guarantee program.[63]

<div align="center">ARGUMENT</div>

    A.   *Commerce's Decision to Reject Information Presented by SeAH at Verification and Instead to Base Its Determination on Adverse Facts Available Was Unsupported by the Evidence and Contrary to Law*

        1.   *There Is No Evidence on the Record to Support Commerce's Finding that SeAH Received a Performance Guarantee from KEXIM during the Relevant Period*

Commerce's determination to apply adverse facts available was based on its conclusion that SeAH had received a performance guarantee from KEXIM during the relevant period.  However, the evidence does not support that claim.

At verification, SeAH had provided information to Commerce regarding a performance guarantee received from KEXIM during 2019.  Commerce's verification report stated that SeAH had disclosed the receipt of a performance guarantee in 2019 that

---

[61] *See* I&D Memo, cmt. 6 at 6-12 (PR-377).

[62] *See id.* at 6.

[63] *See id*. cmt. 6 at 6-12.

remained outstanding in 2020.[64]  However, Commerce did not identify any information indicating that SeAH had *received* a similar guarantee during the 2020 investigation period.  In such circumstances, there was no basis for Commerce to find that any such guarantee had been received by SeAH during 2020, or that SeAH had failed to report any guarantees received during 2020.

In its arguments to Commerce, SeAH pointed out repeatedly that the only KEXIM performance guarantee it had obtained was received in 2019, and not during 2020.[65]  SeAH also repeatedly explained that Commerce had never requested information on KEXIM performance guarantees received prior to 2020.[66]  Commerce's final determination simply ignored those arguments.  Instead, Commerce's determination pretended that the only issue that had to be addressed was whether SeAH's failure to report the guarantee could be excused by the fact that the guarantee in question related to sales of non-subject merchandise to a non-subject country.[67]  As a result, Commerce's final determination simply refused to address the critical issue or to support its determination by any evidence on the record.  In such circumstances, Commerce's determination cannot be sustained.

---

[64] *See* SeAH Verification Report at 9-10 (PR-345, CR-265).

[65] *See* SeAH's September 20, 2022, Third Redacted Case Brief at 25 (PR-374, CR-282) and SeAH's September 20, 2022, Redacted Rebuttal Brief at 2-3 and 4-5 (PR-375, CR-283).

[66] *See id.*

[67] *See* I&D Memo at 72 (PR-377).

2. *SeAH Was Not Instructed or Required to Report*
*KEXIM Performance Guarantees Received Prior*
*to the Calendar-Year 2020 Investigation Period*

As discussed above, Commerce's questionnaire had only requested that SeAH report

KEXIM performance guarantees received during the calendar-year 2020 investigation

period. The precise instruction in the questionnaire was as follows:

6. KEXIM Performance Guarantees

Respond to all questions in the Standard Questions Appendix and
the Loan Benchmark and Loan Guarantee Appendix. Complete the
Loan Template and include it as an attachment to your response in
electronic format using Microsoft Excel. Your response should provide
details regarding all assistance that your company *received* under this
program *during the POI*.[68]

Because Commerce's initial questionnaire did not request information about KEXIM

performance guarantees received prior to 2020, SeAH properly did not include information

about guarantees received prior to 2020 in its response to Commerce's initial

questionnaire. Instead, SeAH correctly reported that it did not receive a guarantee from

KEXIM during the investigation period.[69] Significantly, Commerce's supplemental

questionnaires did not ask SeAH whether it had received such guarantees in previous

years.

Commerce's failure to request that information is striking in comparison to its

treatment of certain grant programs. As discussed above, for certain grant programs,

Commerce's initial questionnaire had asked SeAH to report only grants *received* during

the investigation period. SeAH's response to the initial questionnaire reported, accurately,

that it had not received those grants during the investigation period. Commerce's

---

[68] *See* Initial Questionnaire, Section III at 8 (PR-129).

[69] *See* SeAH's January 10, 2022, Response at 27 (PR-168, CR-136).

supplemental questionnaire then explicitly asked for additional information clarifying whether SeAH had received certain grants during the longer 15-year "average-useful-life" period.  The failure of Commerce's supplemental questionnaire to request similar information concerning KEXIM performance guarantees confirms that SeAH had properly understood the initial questionnaire as requesting information only with respect to guarantees received during the investigation period.

It is well-settled that Commerce may not apply adverse facts available when a respondent fails to submit information that was not requested by Commerce.[70]  In this case, information on KEXIM performance guarantees received by SeAH in 2019 was never requested by Commerce.  Instead, Commerce only asked about guarantees received by SeAH in 2020.  Because SeAH did not receive such guarantees in 2020, its statement in its response to Commerce's initial questionnaire that it had not received such guarantees during the investigation period was accurate and complete.  In such circumstances, Commerce may not lawfully apply facts available with respect to the KEXIM performance guarantees.

---

[70] *See Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1387 (CIT 2019) (explaining that any burden on a respondent "comes with an understanding that a respondent has sufficient notice of what information is considered necessary to allow it to meet its burden" and that Commerce is required to provide respondents with an opportunity to clarify or supplemental a response if such response is considered deficient due to criteria that was not articulated by Commerce).  *See also Queen's Flowers de Colombia v. United States*, 981 F.Supp. 617, 628 (CIT 1997) ("alleged response deficiency cannot support application of {best information available} where the information sought was apparently never requested.") (internal citation omitted).

PUBLIC VERSION

> 3. *The Information Presented by SeAH at Verification to*
>    *Demonstrate that It Had Not Received KEXIM Performance*
>    *Guarantees during the Calendar-Year 2020 Investigation*
>    *Period Was Specifically Requested by Commerce, Is*
>    *Properly Part of the Record, and Cannot Be*
>    *Disregarded as Untimely New Factual Information*

Commerce's final determination asserted that the materials presented by SeAH at verification to demonstrate "non-use" of the KEXIM Performance Guarantee program during the calendar-year 2020 investigation period constituted untimely "new factual information" that was properly rejected by the verifiers.[71]  However, that assertion is based on the false assumption that SeAH had been asked to provide that information earlier in the proceeding and had failed to do so.  That assumption is simply false.

In fact, Commerce never asked SeAH to provide information regarding guarantees received prior to the calendar-year 2020 investigation period.  When SeAH presented the information on guarantees received before 2020 at verification, it was not attempting to supplement the record with positive evidence that would demonstrate that SeAH had received guarantees in those earlier years.  Instead, the information that SeAH presented at verification was in direct response to a specific request in Commerce's verification agenda, as evidence to establish the negative conclusion that SeAH had not, in fact, received any KEXIM guarantees during the calendar-year 2020 investigation period.

As mentioned, Commerce's verification agenda had specifically instructed SeAH to "*provide all appropriate source records* to substantiate the completeness and accuracy of the information in the responses, including ... non-use of programs."[72]  It also instructed SeAH to "be prepared to demonstrate that SeAH Steel Corporation ...  did not receive

---

[71]*See* I&D Memo at 72 (PR-377).

[72] *See* SeAH Verification Agenda at 1 (PR-332).

assistance under these programs" and specifically identified the KEXIM Performance

Guarantee program as one of the programs.[73]  Furthermore, the agenda explicitly stated

that in order to verify "non-use," Commerce "*will … {e}xamine* all notes attached to your

audited financial statements for the POI and prior years of the AUL."[74]  Finally,

Commerce's verification agenda stated that information "*will be accepted at verification…*

when information *is requested by the verifiers*, in accordance with the agenda below, to

corroborate, support, and clarify factual information already on the record."[75]

    In order to respond to these instructions, SeAH needed to demonstrate, through its

normal accounting records, that it had not received any KEXIM performance guarantees

during 2020.  This task was complicated by the fact that, as discussed above, SeAH had

received a performance guarantee in 2019 that guaranteed SeAH's customer against non-

performance by SeAH during 2019 or 2020.  Because that guarantee continued to apply to

performance during 2020, the guarantee amount was included in the total amount of

outstanding guarantees disclosed in one of the notes to SeAH's audited financial

statements, as well as in an internal SeAH document listing the outstanding guarantees in

2020.  Consequently, in order to demonstrate that no such guarantees had been *received* in

---

[73] *See id.*

[74] *See* SeAH Verification Agenda at 6-7 (PR-332).

[75] *See id*. at 2 (PR-332) (highlight added).  *See also Bosun Tools Co. v. United States*, 405 F. Supp. 3d 1359, 1364-65 (CIT 2019) ("{a}n agency abuses its discretion when it issues a decision that 'represents an unreasonable judgment in weighing relevant factors.'…Commerce abused its discretion by failing to consider a separate rate certification filed ninety-five days after the established deadline where the information submitted required minimal analysis, did not result in a great burden, and, if considered, likely would have resulted in the filing party receiving a separate rate").

2020, SeAH needed to establish that the 2019 guarantee that continued to be reflected in its records in 2020 had not been received during the calendar-year 2020 investigation period.

SeAH prepared the necessary materials concerning the 2019 KEXIM performance guarantee as part of a larger package addressing all of the programs for which SeAH had reported "non-use" in its questionnaire responses.  This "non-use" package was presented to the verifiers on the third day of the verification.[76]  To demonstrate that SeAH did not receive a guarantee from KEXIM during the investigation period, SeAH presented:  (1) an excerpt from SeAH's audited financial statements for the 2019 and 2020 fiscal years identifying the value of the 2019 guarantee and confirming that there had been no change in the amount of the outstanding KEXIM guarantee during 2020 and (2) a copy of a letter from KEXIM and the related customer purchase order confirming the value of the guarantee as identified in SeAH's financial statements and that the performance guarantee was received in 2019 in connection with a sale of non-subject merchandise to a third-country.[77]  All of the materials were provided solely "to corroborate, support, and clarify factual information already on the record" for the program identified in the verification agenda using "appropriate source records" and SeAH's financial statements during the average-useful-life period.[78]

---

[76] *See* Statement of Sang-Wook Kim at 2 (PR-353, CR-273).

[77] *See id.* at 2-5.

[78] *See CITIC Trading Co. v. United States*, 27 C.I.T. 356, 373 (2003) (explaining that when Commerce specifically states that it will accept new information corroborating, supporting or clarifying the record during verification, it is not permitted to reject information provided by respondents for that purpose).  *See also TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1354 (CIT 2016) ("Commerce's regulations anticipate the need for Commerce to obtain new factual information before, during, or even after verification.").

On the day after SeAH presented its "non-use" package, the Commerce verifiers asked for additional information on the KEXIM guarantee that SeAH had received in 2019.[79]  In response to that request, SeAH provided information demonstrating that SeAH had made payments to KEXIM in 2019 and 2020 and that KEXIM had made no payments to SeAH or to SeAH's customer under the guarantee.  The information presented in response to Commerce's request also confirmed that the guarantee SeAH had obtained from KEXIM in 2019 related to a sales contract to a non-subject third-country customer for non-subject merchandise.

The statute defines the administrative record as including all "information presented to or obtained by the Secretary, the administering authority, or the Commission during the course of the administrative proceeding."[80]  The information that SeAH presented to the verifiers at verification to demonstrate that it had not received any KEXIM performance guarantees during 2020 plainly falls within the statutory definition.  The information was "presented to" Commerce's verifiers in accordance with the procedures described by Commerce's verification agenda.  And, furthermore, that information was "obtained by" Commerce in response to an explicit request in the verification agenda, as well as follow-up requests by the verifiers.  Consequently, the information presented at verification was plainly part of the record of this proceeding.

This Court has previously recognized that Commerce may not reject information presented at verification "when '(1) the need for that information was not evident previously, (2) the information makes minor corrections to information already on the

---

[79] *See* Statement of Sang-Wook Kim at 5 (PR-353, CR-273).

[80] *See* 19 U.S.C. § 1516a(b)(2)(A).

PUBLIC VERSION

record, or (3) the information corroborates, supports, or clarifies information already on the record.'"[81]  In this case, the information that SeAH presented at verification regarding the KEXIM Performance Guarantee program served to corroborate information already on the record — *i.e.,* SeAH's earlier statement that it did not receive such guarantees during the calendar-year 2020 investigation period.  Commerce's failure to consider that information, when the information was presented at verification in response to Commerce's explicit requests, was unlawful.

> ### 4.   The Information Included in SeAH's Case and Rebuttal Briefs that Commerce Rejected Simply Described What Had Occurred at Verification and Was Not "New" Information

As mentioned, Commerce also incorrectly rejected SeAH's initial Case Brief and Rebuttal Brief for purportedly including untimely new factual information.[82]  The alleged new factual information identified in Commerce's rejection letters consisted of (1) the total amount of the guarantee SeAH received from KEXIM in 2019 (as recorded in SeAH's financial statements) and (2) the description of the actual occurrences at the verification set forth in the sworn statement by the accountant who presented the information at the verification.  But none of that information was "new" or untimely.

*First*, the total amount of the performance guarantee SeAH received from KEXIM in 2019 (*i.e.*, [          ] Korean Won) was identified at Note 34 of SeAH's 2019 financial statements.  Those financial statements were explicitly requested by Commerce's verification agenda and were presented by SeAH as part of the "non-use" verification.  As

---

[81] *CITIC Trading*, 27 C.I.T. at 373.

[82] *See* Letter from R. Janz to J. Winton, September 9, 2022 (PR-357), Letter from R. Janz to J. Winton, September 13, 2022 (PR-363), and Letter from R. Janz to J. Winton, September 19, 2022 (PR-372, CR-281).  *See also* I&D Memo at 74-75 (PR-377).

a result, they fall within the scope of materials that Commerce had explicitly stated "will be accepted" at verification[83]   And, in fact the Commerce verifiers actually did review SeAH's 2019 financial statements.[84]   Moreover, Commerce relied on SeAH's financial statements over the average-useful-life period (which included the 2019 financial statements) to verify the "non-use" of other programs.[85]

As mentioned, the statute provides that the record of a proceeding consists of "a copy of all information *presented to or obtained by* … the administering authority … during the course of the administrative proceeding."[86]   SeAH's 2019 financial statements clearly fall within that definition.  They were "obtained" by Commerce in response to Commerce's explicit request, were "presented" to Commerce at verification, and were reviewed and relied upon by the verifiers.  Commerce's decision to treat the 2019 financial statements as "new factual information" and to disregard information contained in those statements for purposes of verifying "non-use" of the KEXIM Performance Guarantee program during

---

[83] *See* SeAH Verification Agenda at 2 (PR-332).  *See also Bosun Tools Co*, 405 F. Supp. 3d at 1364-65 ("{a}n agency abuses its discretion when it issues a decision that 'represents an unreasonable judgment in weighing relevant factors.'…Commerce abused its discretion by failing to consider a separate rate certification filed ninety-five days after the established deadline where the information submitted required minimal analysis, did not result in a great burden, and, if considered, likely would have resulted in the filing party receiving a separate rate").

[84] *See* SeAH Verification Agenda at 6-7 (PR-332).

[85] *See* Verification Report at 10 ("To determine that SeAH Steel and SSHC did not use any other investigated subsidy programs…. during the course of the verification we reviewed the companies…. financials…") (PR-345, CR-265).

[86] *See* 19 U.S.C. § 1516a(b)(2)(A)(i).

the investigation period was inherently arbitrary and fundamentally inconsistent with Commerce's own verification agenda and its obligations under the statute.[87]

*Second*, the sworn statement by the accountant who prepared and presented the materials on the KEXIM Performance Guarantee program cannot be dismissed as new factual information. The sworn statement simply described what was actually presented and discussed at the verification, including the information provided in response to verifiers' questions during the verification.[88] This Court has previously rejected efforts by Commerce to exclude from the record information that was requested by Commerce and presented and discussed at verification, especially when the information was requested by the verifiers.[89] In this instance, the sworn statement served only to describe what had actually occurred at verification in the presence, and at the request, of Commerce officials. An accurate description of those events is not new factual information.

In addition, even if the Court were to find that the sworn statement provided with SeAH's case brief (or the additional sworn statement provided with this brief) was not part of the administrative record, the Court should take them into account because there is "a reasonable basis to believe the administrative record is incomplete."[90] The sworn statements describe the actual occurrences at the verification and identify misstatements or omissions contained in the verification report. The sworn statements are "not seeking to add to the record information which was obtained or written after Commerce published the

---

[87] *See id. See also Hyundai Electric & Energy Systems v. United States*, 477 F.Supp.3d 1324 (CIT 2020).

[88] *See* Statement of Sang-Wook Kim at 5-6 (PR-353, CR-273).

[89] *Hyundai Electric & Energy Systems*, 477 F.Supp.3d 1324.

[90] *Saha Thai Steel Pipe Co. v. United States*, 661 F.Supp. 1198, 1201-02 (1987).

final determination."[91]  Instead, all of the information in the sworn statements had been "in front of Commerce during the investigation, regardless of whether or not Commerce chose to ignore it."[92]

Commerce has a statutory obligation to include on the record the information presented to the verifiers during the investigation.[93]  However, as described in the sworn statement provided with SeAH's case brief, Commerce's rejection of material that was properly on the record rendered the administrative record incomplete.  In these circumstances, the Court should accept the sworn statements as part of the record, and require Commerce to address the factual information in those statements concerning the documentation presented at verification and the verifiers' response to that documentation.

B.   *Commerce Decision to Apply Adverse Facts*
     *Available for the KEXIM Performance Guarantee*
     *Was Unlawful and Unsupported by the Evidence*

Commerce's final determination claimed that SeAH's response to the initial questionnaire's questions regarding the KEXIM Performance Guarantee program "failed to provide *requested* necessary information" that significantly impeded Commerce analysis of the KEXIM Performance Guarantee program and warranted the use of facts available with an adverse inference.[94]  However, as discussed above, the record makes clear that Commerce did *not*, in fact, "request" information on performance guarantees received

---

[91] *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 980 F. Supp. 485, 487 (CIT 1997) (accepting affidavits regarding omitted information of ex parte telephone conversations because the information was presented to Commerce during the investigation).

[92] *Id.*

[93] *See* 19 U.S.C. § 1516a(b)(2)(A)(i).

[94] *See* I&D Memo at 6 (PR-377).

from KEXIM *prior to* the calendar-year 2020 investigation period.  Commerce's failure to request that information is fatal to its effort to apply *adverse* facts available to SeAH.

> 1. *Commerce May Not Resort to Facts Available When it Failed to Request the Information*

As explained above, Commerce's initial questionnaire requested information only with respect to KEXIM performance guarantees received during the investigation period (*i.e.*, the 2020 calendar year).[95]  Therefore, information concerning any performance guarantees that SeAH may have received from KEXIM prior to the investigation period was *not* requested by Commerce's questionnaire.

SeAH's case brief did note that it was unclear whether Commerce's questionnaire had requested information on *all* KEXIM performance guarantees, or just on performance guarantees related to loans.  In its final determination, Commerce responded that it was SeAH's responsibility to seek clarification if it was unsure what information was required to be reported.[96]  But that answer has no bearing on the issue whether the questionnaire requested information on performance guarantees received prior to 2020.  The questionnaire explicitly stated that SeAH was only required to provide information on guarantees during the investigation period (*i.e.*, the 2020 calendar year).  SeAH, therefore, had no reason to address any KEXIM performance guarantees received in years prior to 2020.

Under the statute, Commerce must provide sufficient notice to respondents of the type and scope of information requested before resorting to facts available.[97]  Furthermore, this

---

[95] *See* Initial Questionnaire, Section III at 8 (PR-129).

[96] *See* I&D Memo at 71 (PR-377).

[97] *See* 19 U.S.C. § 1677m(d).

Court has held that Commerce fails to provide such notice when Commerce does not "specifically" request the information.[98]  As a result, if Commerce believed that information on KEXIM performance guarantees received before 2020 was necessary, it was Commerce's responsibility to specifically request that information in its questionnaires.[99]  Furthermore, if Commerce concluded that SeAH's initial response was deficient, it was Commerce's responsibility to seek additional information to remedy the deficiency.[100]

SeAH filed its response to Section III of Commerce's initial questionnaire on January 10, 2022.  That submission contained SeAH's response for the KEXIM Performance Guarantee program, stating that "SeAH and SSHC did not have any performance guarantees from KEXIM for loans that were outstanding during the investigation period."[101]  It was evident from that response that SeAH did not provide any information on guarantees (not tied to loans) that were received prior to the investigation period.  If, after reviewing that response, Commerce believed that it also needed

---

[98] *See e.g.*, *Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804, *12-*13 (1999) (finding that, where Commerce had failed to request information "specifically," it had failed to provide plaintiff with sufficient notice under 19 U.S.C. § 1677m(d)).

[99] *See* note 70, above.

[100] *See* 19 U.S.C. § 1677e(a) (explaining that Commerce's ability to resort to facts available is "subject to section 1677m(d) of this title").  *See also* 19 U.S.C. § 1677m(d) ("If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority… shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations…").

[101] *See* SeAH's January 10, 2022, Response at 27 (PR-168, CR-136).

PUBLIC VERSION

information on such guarantees received before the investigation period, it was Commerce's responsibility to ask for that information in a supplemental questionnaire.

As noted above, Commerce did request supplemental information regarding certain grant programs, when the initial questionnaire had only requested information concerning grants received during the investigation period, but Commerce subsequently concluded that information on grants received in prior years was also needed.  For example, Commerce's initial questionnaire requested that SeAH report "the total amount of assistance that was provided…. *during the POI* under the" Management of Electricity Factor Load grant program.[102]  In response, SeAH reported that "{n}either SeAH nor SSHC entered into an agreement with KEPCO or KPX, or benefited from the "Management of Electricity Load Factor" during the investigation."  In a supplemental questionnaire, Commerce then requested that SeAH also report whether it was approved for or received any amount under the "Management of Electricity Load Factor" program (amongst others) during the average-useful-life period.[103]

If Commerce had raised a similar concern about KEXIM performance guarantees received prior to 2020 in its supplemental questionnaires, SeAH could have provided — indeed, would have been required to provide — information about the KEXIM performance guarantee it received in 2019.  But, in the absence of any such request by Commerce, SeAH had no reason to believe that its response to the initial questionnaire — which had only requested information about guarantees received during the 2020 calendar-year investigation period — was in any way insufficient.

---

[102] *See* Initial Questionnaire, Section III at 17 (PR-129).

[103] *See* First Supplemental Questionnaire, 4 at Question I.1 (PR-249, CR-209).

Commerce's final determination asserted that the application of adverse facts available was appropriate because SeAH "selectively reported what it considered necessary and sufficient" and made a "unilateral decision not to report" the KEXIM performance guarantee that it received in 2019.[104]  That assertion is plainly without merit.  This is not a case in which Commerce requested information about guarantees received before 2020 and SeAH refused to provide it.  This is not a case in which the questionnaire was ambiguous as to whether information on guarantees received before 2020 was required.  And, this is not a case in which Commerce identified a deficiency in SeAH's initial response and SeAH failed to remedy it.  Instead, this is a case in which Commerce only requested information regarding guarantees received during 2020, and then punished SeAH for responding to the question as it was written.  Nothing in the statute or in the past decisions by Commerce or the Court justifies that position.  Because Commerce did not request information regarding KEXIM performance guarantees received prior to 2020, Commerce's cannot lawfully apply adverse facts available to SeAH for failing to provide the information that was never requested.[105]

     2.    *SeAH Was Not Required to Report the 2019 KEXIM Performance Guarantee as an "Other" Subsidy*

Commerce's final determination also asserted that SeAH should have reported information on the KEXIM performance guarantee received prior to the investigation

---

[104] I&D Memo at 72 (PR-377).

[105] *See e.g.*, *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) citing *NSK LTD. v. United States*, 481 F. 3d 1355, 1360 n.1 (Fed. Cir. 2007) (explaining that Commerce fulfills its obligation under Section 1677m(d) of the statute when it issues a supplemental questionnaire specifically pointing out and requesting clarification of a deficient response).

period under the "Other Subsidies" section of its initial questionnaire.[106]  But that position is patently unreasonable.

Commerce's initial questionnaire in countervailing duty cases asks respondents to report information of specific programs that have been deemed by Commerce as sufficiently alleged in the petition.  In addition, the initial questionnaire asks respondents to self-report any "other subsidies" that may have conferred a benefit to the respondent during the investigation period and average-useful-life period.  Commerce included such a question on "other subsidies" in its initial questionnaire to SeAH for the investigation that is subject of this appeal.[107]

As a preliminary matter, the plain language of the "other subsidies" question makes clear that the question is limited to programs that were not specifically identified elsewhere in the questionnaire.  It would make no sense to refer to "other" subsidies if the question was intended to refer to particular subsidies that had already been identified.  That understanding has been confirmed by Commerce and this Court.  Specifically, Commerce has explained that the "other subsidies" question in its questionnaire reflects its "investigative authority to ask questions about other governmental assistance, *beyond the subsidies alleged by the petitioner*."[108]  Furthermore, the decisions by this Court confirm that the "other subsidies" question in Commerce's questionnaire in countervailing duty

---

[106] *See* I&D Memo at 71 (PR-377).

[107] *See* Initial Questionnaire, Section III at 18 (PR-129).

[108] *See Certain Collated Steel Staples from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 85 Fed. Reg. 33626, and accompanying I&D Memo at cmt. 2.

PUBLIC VERSION

cases only requires respondents to report any *other programs* not specifically alleged in the petition or questionnaire.[109]

In this case, Commerce has admitted that the performance guarantee that SeAH obtained from KEXIM in 2019 falls under the KEXIM Performance Guarantee program described in the petition and in Commerce's initiation checklist.[110]  Commerce has also contended that information regarding the performance guarantee that SeAH received from KEXIM was requested by the section of its initial questionnaire concerning the KEXIM Performance Guarantee program.[111]  In such circumstances, where Commerce has admitted that the KEXIM performance guarantee received by SeAH falls under the section of the questionnaire specifically addressing such guarantees, the guarantee cannot also fall under the "other subsidies" section of the questionnaire.

In the end, the record of this case is clear:  any impediment to Commerce's ability to investigate KEXIM performance guarantees received prior to 2020 was a direct result of the agency's own failure to request information about guarantees received during that time period.  There is no basis in the statute, regulations, or case law to punish a respondent with adverse facts available when the failure to collect information was the fault of the

---

[109] *See e.g.*, *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1345 (CIT 2016); *see also Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1339 (CIT 2021).

[110] *See* I&D Memo at 71 (PR-377).

[111] *See id*. at 71 and note 430 (identifying that information on the performance guarantee was specifically requested in the question for the KEXIM Performance Guarantee program at page 27 of the initial questionnaire) (PR-377).

agency itself.[112]  In these circumstances, Commerce's application of adverse facts available to SeAH for the KEXIM Performance Guarantee program must be remanded.

C.   *The Record Evidence Does Not Support Commerce's Conclusion that the Performance Guarantee Obtained by SeAH in 2019 Constituted a Counter-vailable Subsidy during the Investigation Period*

As discussed above, the information that SeAH presented at verification in response to Commerce's explicit request was not untimely and is properly considered part of the record of this proceeding.  That record evidence demonstrates that SeAH did not receive any KEXIM performance guarantees during the investigation period.  While SeAH did receive a guarantee in 2019, any benefit from that guarantee would, under Commerce's longstanding practice, have to be assigned to 2019, and would not affect the calculation of SeAH's subsidy rate for the 2020 investigation period.  And, finally, the amount of the benefit of the guarantee, even under the most adverse assumptions possible, was plainly *de minimis.*

1.   *The Evidence Presented at Verification Confirms that the KEXIM Performance Guarantee Had Been Received by SeAH in 2019, not 2020*

According to Commerce, loans and guarantees, including those that remain outstanding during the investigation period, are considered to have been "received" during the year the "terms were agreed upon."[113]  As explained, the "non-use" package presented at verification included a copy of the performance guarantee contract between SeAH and KEXIM.  That document clearly stated that the agreement was made in 2019.

---

[112] *See* note 70 above.

[113] *Final Affirmative Countervailing Duty Determination; Oil Country Tubular Goods from Spain*, 49 Fed. Reg. 47060, 47061-62 (Nov. 30, 1994).

Furthermore, Commerce's own verification report explicitly confirmed that the Commerce verifiers had been told that the relevant KEXIM performance guarantee was received by SeAH in 2019.[114]  In these circumstances, the evidence conclusively demonstrates that the performance guarantee that SeAH obtained from KEXIM was received in 2019 and not during the calendar-year 2020 investigation period.

　　As discussed above, it is clear that Commerce did rely on the information in the "non-use" package presented at verification when making its final determination.  There was no evidence on the record, other than the materials presented in the "non-use" package, that indicated that SeAH had received *any* performance guarantees from KEXIM during *any* period.  Instead, the only other evidence concerning the use of the KEXIM Performance Guarantee program was SeAH's accurate statement in its initial questionnaire response that it had not received any such guarantees during the investigation period.

　　In these circumstances, the evidence relied upon by Commerce simply does not support its determination that SeAH had received a KEXIM performance guarantee during the relevant period but had improperly failed to disclose the receipt of that guarantee.  Instead, the evidence included by Commerce in the record *and* the additional documentation presented by SeAH at verification and relied upon by Commerce for other purposes fully confirmed that SeAH had not received any such guarantee during the calendar-year 2020 investigation period, just as SeAH had reported in its initial questionnaire response.  Commerce's suggestion that SeAH had received a performance guarantee during 2020 cannot be sustained.

---

[114] *See* Verification Report at 10 ("Company officials stated that SeAH did not report the performance guarantee in its questionnaire response because the guarantee related solely to non-subject merchandise sold to a third country and, further, both the purchase order and KEXIM agreement were made in 2019.") (PR-345, CR-265).

2. *The Evidence Presented at Verification Demonstrates
that the KEXIM Performance Guarantee Did Not
Benefit SeAH's Exports of OCTG to the United States*

The "non-use" package presented by SeAH at verification also clearly establishes that

the KEXIM performance guarantee received by SeAH in 2019 was obtained for a specific

purchase order for sales of stainless pipe to Canada, in accordance with the terms of the

sales agreement with the Canadian customer.  As a result, the amount of the guarantee

cannot be treated as a countervailable "benefit" attributed to SeAH's sales of OCTG to the

United States.[115]

In its final determination, Commerce asserted that it could not determine whether the

guarantee that SeAH obtained from KEXIM in 2019 related to the sale of non-subject

merchandise to a third country, because all documentation concerning the KEXIM

performance guarantee had been rejected by Commerce at verification and, therefore, was

not on the record.[116]  However, this Court has explained that when Commerce relies on

certain material to support one aspect of its determination to apply adverse facts available,

it may not reject that same material in order to justify its position on another aspect of its

adverse-facts-available analysis.[117]

In this case, Commerce relied on the materials presented at verification to conclude

(1) that SeAH failed to report "requested necessary information" to evaluate the KEXIM

Performance Guarantee program, and (2) that SeAH's reporting failure warranted

---

[115] 19 C.F.R. § 351.524(b)(1)-(2) (explaining that "any "subsidy" that is tied to a particular
market or product will be attributed to that market or product).

[116] *See* I&D Memo at 72 (PR-377).

[117] *See POSCO v. United States*, 353 F. Supp. 3d 1357, 1376 (CIT 2018).

application of adverse facts available.[118]  But, having relied on the materials presented at verification for that purpose, Commerce may not ignore the fact that the very same materials explicitly stated that the guarantee was not related to the sale of subject merchandise to the United States.  Instead, Commerce must address this evidence in light of the complete record to support its application of adverse facts available to SeAH for the KEXIM Performance Guarantee program.  Because the evidence demonstrates that the guarantee related specifically to a sale of non-subject merchandise to a third country, Commerce's decision to treat the guarantee relating to SeAH's sales of OCTG cannot be sustained.

> 3.  *The Evidence Presented at Verification Demonstrates that Any Benefit from the KEXIM Performance Guarantee was De Minimis*

Under Commerce's regulations, the amount of a "recurring" subsidy is typically allocated only to the year of receipt,[119] while the amount of a "non-recurring" subsidy is typically allocated over the average useful life.[120]  However, when the total amount approved under a non-recurring program is less than 0.5 percent of relevant sales during the year it was approved, the "benefit" will be fully allocated to the year of approval.[121]

As described above, Commerce's questionnaire treated the KEXIM Performance Guarantee program as a recurring subsidy, by requesting only that SeAH report information on guarantees received during the calendar-year 2020 investigation period.  As

---

[118] *See* I&D Memo at 71 (PR-377).

[119] *See* 19 C.F.R. § 351.524(a).

[120] *See* 19 C.F.R. § 351.524(b)(1).

[121] *See id*.

such, any "benefit" arising from the guarantee received in 2019 cannot be attributed to the calendar-year 2020 investigation period.

But even if Commerce had considered the KEXIM Performance Guarantee program to be a non-recurring subsidy, there would be no basis for allocating any of subsidy amounts from guarantees received in previous years to the calendar-year 2020 investigation period. As described above, the total amount of the guarantee received from KEXIM in 2019 (as recorded in SeAH's 2019 financial statement and other documents presented at verification) was [          ] Korean Won, and the total amount of SeAH's export sales during the 2019 calendar year was [             ] Korean Won.[122] Accordingly, even if the entire value of the guarantee had improperly been found to confer a "benefit," the purported "benefit" from the guarantee would account for less than 0.5 percent of SeAH's relevant sales and would be fully allocated to the 2019 calendar year.

In this regard, Commerce's final determination asserted that it was "unable to analyze when any such benefit might be allocated," because it is unclear whether the program should be treated as a guarantee or as export insurance.[123] But that assertion is fundamentally inconsistent with the evidence on the record and the factual determinations Commerce made regarding the KEXIM Performance Guarantee program.

As mentioned, Commerce stated in its final determination that the guarantee that SeAH received from KEXIM was the type covered by the KEXIM Performance Guarantee program included in its initial questionnaire. Consistent with the description of that

---

[122] *See* SeAH's March 2, 2022, Supplemental Questionnaire Response at Appendix S-1 (PR-268, CR-225-226).

[123] *See* I&D Memo at 74 (PR-377).

program, and evident from the name, the KEXIM Performance Guarantee program is in fact a guarantee of export performance and not an export-insurance program.[124] Furthermore, in determining the adverse-facts-available rate, Commerce selected the subsidy rate applicable to another guarantee program rather than an export insurance program.  In that regard, Commerce declared that the K-SURE Export Credit Guarantee program was a comparable program to the KEXIM Performance Guarantee program "because both programs are export-specific *guarantee* programs."[125]  In these circumstances, there is no basis for Commerce to claim ignorance as to the proper allocation of any "benefit" under the KEXIM Performance Guarantee program.[126]

Commerce's longstanding practice is to assign the benefit of guarantees to the year in which the guarantee was issued by the government.[127]  In accordance with that practice, Commerce was required to assign the benefit of the performance guarantee that SeAH received in 2019 to the year of receipt, and not to the calendar-year 2020 investigation

---

[124] It should also be noted that the record makes clear that the performance guarantee that SeAH obtained from KEXIM was not related to a loan.  *See e.g.*, Verification Report at 5-7 (confirming that there were no discrepancies related to the loan information reported by SeAH) and 10 (describing the guarantee was related to an export sales contract) (PR-345, CR-265).

[125] I&D Memo at 10 (PR-377).

[126] *See e.g.*, *Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d 1265, 1276 (CIT 2017) (explaining that the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight, including contradictory evidence or evidence from which conflicting inferences could be draw) (internal quotations and citations omitted).

[127] *See e.g.*, *Final Affirmative Countervailing Duty Determination: Steel Wire Rod from Germany*, 62 Fed. Reg. 54990 (Oct. 22, 1997) at "B. BES" (explaining that Commerce declined to analyze whether a guarantee received prior to the investigation period gave rise to a countervailable subsidy during the investigation period, because there was no benefit allocable to the investigation period).

period.  Consequently, Commerce's failure to allocate the purported "benefit" from the

KEXIM performance guarantee to the 2019 calendar year cannot be sustained.

> 4.   *Commerce's Claim that SeAH Had Not Been Fully
>       Cooperative, and that a Punitive Rate Should
>       Therefore Be Applied, Is Contrary to the Evidence*

Commerce's final determination applied an adverse-facts-available rate for the

KEXIM Performance Guarantee program based on the last tier of the hierarchy that

Commerce employs when selecting amongst available subsidy rates for a program.[128]

Commerce stated that it was permitted to apply that rate (which is more punitive than other

tiers of the hierarchy) because SeAH had not been cooperative.[129]

But Commerce's conclusion that SeAH failed to cooperate in the investigation is

contrary to the evidence on the record.  SeAH responded fully and accurately to all of

Commerce's requests for information.  As discussed above, Commerce's questionnaire did

not request information on KEXIM performance guarantees received before the calendar-

year 2020 investigation period.  Consequently, the absence of information concerning pre-

2020 KEXIM performance guarantees in SeAH's initial questionnaire response reflected

Commerce's failure to communicate that such information was required, not SeAH's

failure to cooperate.

Furthermore, the allegedly "new" information that SeAH presented at verification had

been specifically requested by Commerce and was presented by SeAH simply to confirm

the accuracy of SeAH's previous statement that it had not received any KEXIM

performance guarantees during the calendar-year 2020 investigation period.  Because

---

[128] *See* I&D Memo at 10-11 (PR-377).

[129] *See id.* at 7 and 9.

SeAH responded fully to Commerce's actual requests and then demonstrated that the

information it had submitted in response to those requests was accurate, Commerce may

not apply *adverse* facts available when calculating the subsidy benefit from the KEXIM

Performance Guarantee program.[130]

> 5.   *The Punitive Subsidy Rate Applied by Commerce*
> *as Adverse Facts Available for the KEXIM*
> *Performance Guarantee Was Not Corroborated*

The statute provides that, when Commerce uses information as facts available, it must

"to the extent practicable, corroborate that information from independent sources that are

reasonably at their disposal."[131]   Commerce failed to meet that requirement in this case.

Commerce's final determination asserted that it was permitted to apply the highest

previous rate found for the K-SURE Export Credit Guarantee program as adverse facts

available for the KEXIM Performance Guarantee program, because Commerce has not

previously calculated a subsidy for the KEXIM Performance Guarantee program and

information needed to corroborate the subsidy rate was not on the record.[132]   But there was

ample evidence reasonably available to Commerce to corroborate whether the rate it

applied as adverse facts available was reasonable.

As discussed above, the evidence presented to Commerce at verification demonstrated

that the KEXIM performance guarantee received by SeAH in 2019 (not 2020) had a

guarantee amount of [              ] Korean Won.[133]   As described above, that information

---

[130] *See* 19 U.S.C. § 1677e(b)(1).

[131] *See id.*

[132] *See* I&D Memo at 10-12 (PR-377).

[133] As previously explained, the record of this proceeding includes all information
"presented to" Commerce.  *See* 19 U.S.C. § 1516a(b)(2)(A)(i).

was provided in response to a specific request from Commerce that SeAH demonstrate that it had not received any guarantee from KEXIM during the calendar-year 2020 review period.  The same figure was also set forth in the notes to SeAH's financial statements for its 2019 fiscal year period — financial statements that Commerce had explicitly stated it would (and did) examine and accept as part of the non-use verification.[134]  And, even if Commerce properly rejected the documentation presented by SeAH at verification, the 2019 SeAH financial statements were readily available to Commerce in the public versions of SeAH's submissions in other proceedings.[135]

Nevertheless, as discussed above, even if the entire guarantee amount had improperly been found to constitute a subsidy during the investigation period, the purported "benefit" from the guarantee would account for less than 0.5 percent of SeAH's relevant sales and would have to be fully allocated to the 2019 calendar year.  And, finally, even if Commerce were permitted to improperly treat the guarantee amount as a benefit received

---

[134] *See* SeAH Verification Agenda at 6-7 (stating that in order to verify non-use, Commerce "*will*….{e}xamine all notes attached to your audited financial statements for the POI and prior years of the AUL.") (PR-332).

[135] In this regard, it should be noted that SeAH has been examined by Commerce as a respondent in reviews of the antidumping orders on OCTG, Welded Line Pipe, and Heavy-Walled Rectangular Pipe for the 2019-20 review period and in the review of the countervailing duty order on Large Diameter Welded Pipe for the 2019 review period, and has submitted its 2018-2019 financial statements as public documents in all of those reviews.  Nothing prevented Commerce, as part of its "corroboration" process, from reviewing those publicly-available materials, all of which are accessible on Commerce's own ACCESS electronic docket system.  *See* 19 C.F.R. § 351.308(d) (explaining that when Commerce resorts to secondary information to determine the adverse-facts-available rate it must "corroborate that information from independent sources that are reasonably at {its} disposal).

in 2020, the "subsidy" rate for the program would only have been [      ] percent.[136]  There is no corroboration for a rate higher than that.[137]

<div align="center">CONCLUSION</div>

The evidence in this case demonstrates that SeAH responded accurately to the actual question set forth in Commerce's questionnaire when it reported that it had not received any KEXIM performance guarantees during the calendar-year 2020 investigation period. At verification, SeAH fully documented the accuracy of that statement.  As part of that demonstration, SeAH showed that the only KEXIM performance guarantee on its books in 2020 had been received in 2019 (and therefore did not have to be reported in response to Commerce's questionnaire, which only requested information on KEXIM performance guarantees received in 2020).

Rather than deal with the substance of SeAH's argument, Commerce attempted to manipulate the record to support its false claim that SeAH had improperly failed to report a KEXIM performance guarantee that fell within the scope of the reporting requirements defined by Commerce, even though those requirements were explicit that the only guarantees that need to be reported were those received in 2020.  And, based on this manipulation of the record and false accusations, Commerce transformed what should have been a negative subsidy determination (with a subsidy rate well below the one percent *de minimis* threshold) into an affirmative final determination.

---

[136] *See e.g.*, Commerce's June 29, 2022, Post-Preliminary Calculation for SeAH, Attachment 2 at "Sales" worksheet (identifying SeAH's "total exports" for the 2020 calendar year equaled [                           ] Korean Won) (PR-313, CR-243-44).

[137] *See* 19 U.S.C. § 1677e(c).

PUBLIC VERSION

Such behavior should be abhorrent to any fair-minded observer.  Commerce's actions were not consistent with the evidence on the record or with the procedures required by the statute and Commerce's own regulations and practice.  Accordingly, Commerce's decision to apply adverse facts available to create an affirmative subsidy finding where none existed must be overturned.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Amrietha Nellan
Jooyoun Jeong

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

</div>

March 17, 2023

<u>C</u>ERTIFICATE OF <u>C</u>OMPLIANCE

     Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 11,947 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.

                                            /s/Jeffrey M. Winton

March 17, 2023

Attachment

서울특별시 강남구 테헤란로 333, 7층
(역삼동, 신도벤처타워)
[별지 제41호서식]



공증
인가 **법무법인 양재**
Law Firm Yang jae

(전화) 02-522-4264
(팩스) 02-522-4297

Registered No.    2023 -    348

# NOTARIAL CERTIFICATE

## LawFirm YangJae

### (SindoVentureTower, Yeoksam-dong)

### 7F, 333, Teheran-ro, Gangnam-gu, Seoul, Republic of Korea



210mm X 297mm
보존용지(1종) 70g/m²

Business Proprietary Treatment Requested

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE MARK A. BARNETT, JUDGE



| | |
|---|---|
| SEAH STEEL CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>BORUSAN MANNESMANN PIPE U.S. INC.,)<br>ET AL., )<br><br>Defendant- )<br>Intervenors. ) | Court No. 22-00338 |

STATEMENT OF SANG-WOOK KIM

Sang-Wook Kim, being duly sworn, deposes and says as follows:

1.    My name is Sang-Wook Kim.  I am a U.S. Certified Public Accountant,

employed by The ITC Consulting Company in Korea.  I was present at the verification of

the questionnaire responses submitted by SeAH Steel Corporation in the Countervailing

Duty Investigation of Oil Country Tubular Goods ("OCTG") from Korea (Case No.

C-580-913) that was conducted by the U.S. Department of Commerce from August 22 to

August 25, 2022.  I personally presented a number of those packages to the verifiers,

including the package concerning the "non-use" of various alleged subsidy programs, and

was present when the verifiers informed SeAH of its decision on the last day of

verification not to include in its verification exhibits the materials that SeAH had presented demonstrating the non-use of the KEXIM Performance Guarantee program.

2.    Jacob Garten, the Commerce official who was primarily responsible for verification of the non-use of the KEXIM Performance Guarantee, discussed with me and SeAH's legal counsel how he intended to write-up the issue in the verification report.  He then read aloud to me and to SeAH's legal counsel (Jeffrey Winton and Amrietha Nellan) his draft of the discussion in the verification report concerning the KEXIM Performance Guarantee program.

3.    As read to us by Mr. Garten, his initial draft stated, *inter alia,* that SeAH had claimed that the KEXIM Performance Guarantee had not been reported because the guarantee received by SeAH related to the sale of non-subject merchandise to a third country.  The draft initially read to us did not address SeAH's argument that the guarantee did not have to be reported because it was received in 2019.

4.    In response, SeAH's counsel Amrietha Nellan informed Mr. Garten that the draft did not accurately reflect SeAH's position.  Ms. Nellan stated that, in SeAH's view, the reason the KEXIM performance guarantee did not have to be included in SeAH's response to Commerce's initial questionnaire was that the questionnaire only requested information on KEXIM Performance Guarantees received during 2020, while the guarantee that SeAH had received was received in 2019, not 2020.  Mr. Garten then informed us that he would revise the draft to include that argument.

5.    The draft read to us by Mr. Garten also explicitly mentioned the amount of the

guarantee as identified in SeAH's 2019 financial statement.  SeAH's counsel and I

confirmed that the description of the value of the guarantee in the draft report was accurate.

_Sang Wook Kim_

Sang-Wook Kim, C.P.A.

Sworn to and subscribed before me this 17th day of March, 2023.

_March 17, 2023_

서울특별시 강남구 테헤란로 333, 7층
(역삼동, 신도벤처타워)
[별지 제42호서식]



(전화) 02-522-4264
(팩스) 02-522-4297

등부 2023 년  제 348호

# 인    증

위 김상욱의진술서——————————
에 기재된 김상욱————————————
————————————————————
————————————————————

은 본 공증인의 면전에서 위 사서증서에
자기가 서명 – 한 것임을 자인하였다.

2023년 03월 17일
  이 사무소에서 위 인증한다.

공증
인가 **법무법인 양재**

서울중앙지방검찰청

서울특별시 강남구 테헤란로 333, 7층
(역삼동, 신도벤처타워)

———————————————
공증담당변호사    한  택  근

본 사무소는 인가번호 제15150호에 의거하여
2020년 02월 07일 법무부 장관으로부터
공증인 업무를 행할 것을 인가 받았다.

Registered No. 2023-348

# NOTARIAL CERTIFICATE

Sang Wook Kim————————————

————————————————————

personally appeared before me and
admitted his(her) subscription to the
attached ————————————————
STATEMENT OF SANG-WOOK KIM

————————————————————

————————————————————

————————————————————

This is hereby attested on this
17th day of Mar. 2023 at this office.

**LawFirm YangJae**

**Seoul Central District Prosecutor's Office**

**(SindoVentureTower, Yeoksam-dong)**

**7F, 333, Teheran-ro, Gangnam-gu,**

**Seoul, Republic of Korea**

——————————————————
Signature of the Notary Public
**Han,Taek-Keun**

This office has been authorized by the
Minister of Justice, the Republic of
Korea, to act as Notary Public Since
7, Feb. 2020 Under Law No.15150.

210mm X 297mm
보존용지(1종) 70g/㎡