UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION,<br><br>               Plaintiff,<br><br>               v.<br><br>UNITED STATES,<br><br>               Defendant,<br><br>               and<br><br>BORUSAN MANNESMANN PIPE<br>U.S. Inc, et al.,<br><br>               Defendant-Intervenors. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Ct. No. 22-00338 |

## ORDER

Upon consideration of plaintiff's motion for judgment on the agency record, responses thereto, replies, and upon consideration of other papers and proceedings had herein, it is hereby:

ORDERED that plaintiff's motion is denied;

ORDERED that the Department of Commerce's determination is sustained in all respects.

Dated: _____, 2023         _____
      New York, New York                                      CHIEF JUDGE

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

———————————————————————

| | |
|---|---|
| SEAH STEEL CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | )   Ct. No. 22-00338 |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| BORUSAN MANNESMANN PIPE | ) |
| U.S. Inc, et al., | ) |
| | ) |
| Defendant-Intervenors. | ) |

———————————————————————

**DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

<table>
<tr><td></td><td>BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General</td></tr>
<tr><td></td><td>PATRICIA M. McCARTHY<br>Director</td></tr>
<tr><td>OF COUNSEL:</td><td>CLAUDIA BURKE<br>Deputy Director</td></tr>
<tr><td>SPENCER NEFF<br>Attorney<br>Office of the Chief Counsel<br>   for Trade Enforcement & Compliance<br>U.S. Department of Commerce</td><td>HARDEEP K. JOSAN<br>Trial Attorney<br>Commercial Litigation Branch<br>Civil Division<br>U.S. Department of Justice<br>26 Federal Plaza, Suite 346<br>New York, New York 10278<br>Tel.: (212) 264-9245<br>Fax:  (212) 264-1916</td></tr>
<tr><td>May 16, 2023</td><td>Email: hardeep.k.josan@usdoj.gov</td></tr>
</table>

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ............................................................. 1

   I.   Administrative Determination Under Review ..................................................... 1

   II.   Issues Presented for Review .......................................................................... 2

STATEMENT OF FACTS ................................................................................... 2

SUMMARY OF THE ARGUMENT........................................................................ 7

ARGUMENT.................................................................................................... 8

   I.   Standard Of Review ..................................................................................... 8

   II.   Commerce Properly Rejected New Factual Information Related To SeAH's
Use Of The KEXIM Performance Guarantees Program That SeAH Presented
To Commerce For The First Time At Verification ............................................ 9

   III.   Commerce's Application Of Facts Available With An Adverse Inference With
Respect To The KEXIM Performance Guarantees Program Is Supported By
Substantial Evidence And In Accordance With Law ...................................... 13

     A. Legal Framework ................................................................................. 14

     B. SeAH Failed To Disclose Its Usage Of KEXIM Performance Guarantees
In Response To Commerce's Initial Questionnaire ...................................... 14

     C. Commerce's Determination That SeAH Withheld Information, Significantly
Impeded The Review, And Did Not Act To The Best Of Its Ability Is
Supported By Substantial Evidence ......................................................... 20

     D. Commerce Properly Did Not Consider SeAH's Argument That the KEXIM
Performance Guarantee did Not Provide A Countervailable Benefit ............. 23

CONCLUSION ............................................................................................... 24

# TABLE OF AUHTHORITIES

**Cases**

*Acciai Speciali Terni v. United States* ,
120 F. Supp. 2d 1101 (Ct. Int'l Trade 2000) ............................................................. 12

*Allegheny Ludlum Corp. v. United States*,
112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ............................................................. 17

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) ................................................................................. 8

*Bomont Indus. v. United States*,
733 F. Supp. 1507 (Ct. Int'l Trade 1990) .................................................................. 9

*CITIC Trading Co. v. United States*,
27 C.I.T. 356 (Ct. Int'l Trade 2003) ......................................................................... 11

*Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*,
44 F. Supp. 2d 229 (Ct. Int'l Trade 1999) .............................................................9, 12

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ................................................................................................... 8

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ................................................................................................... 8

*Essar Steel Ltd. v. United States*,
721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ........................................................... 22

*Essar Steel Ltd. v. United States*,
753 F.3d 1368 (Fed. Cir. 2014) ............................................................................... 22

*Guizhou Tyre Co. v. United States,*
523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) .......................................................11, 21

*Hung Vuong Corp. v. United States*,
483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) .........................................................9, 10

*Hyundai Elec. & Energy Sys. v. United States*,
477 F. Supp. 3d 1324 (Ct. Int'l Trade 2020) ........................................................... 12

*Hyundai Heavy Indus. v. United States*,
399 F. Supp. 3d 1305 (Ct. Int'l Trade 2019) .......................................................19, 22

*INS v. Elias-Zacarias*,
502 U.S. 478 (1992) ........................................................................................ 8

*Jindal Poly Films Ltd. of India v. United States*,
365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ......................................................... 17

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) ........................................................................ 14

*Nucor Corp. v. United States*,
612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ......................................................... 8

*Peer Bearing Co. v. United States*,
766 F.3d 1396 (Fed. Cir. 2014) ........................................................................ 14

*POSCO v. United States*,
353 F. Supp. 3d 1357 (Ct. Int'l Trade 2018) ........................................................ 23

*Ta Chen Stainless Steel Pipe v. United States*,
23 C.I.T. 804 (1999) ...................................................................................... 18

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
435 U.S. 519 (1978) ........................................................................................ 9

**Statutes**

19 U.S.C. 1516a(b)(1) ..................................................................................... 2

19 U.S.C. 1516a(b)(1)(B)(i) ............................................................................. 8

19 U.S.C. 1516a(b)(2) ..................................................................................... 2

19 U.S.C. 1516a(b)(2)(A)(i) ............................................................................ 11

19 U.S.C. § 1671b(b)(4) .................................................................................. 4

19 U.S.C. § 1677d .......................................................................................... 18

19 U.S.C. § 1677e(a) ...................................................................................... 14

19 U.S.C. § 1677e(a)(1) .................................................................................. 19

19 U.S.C. § 1677e(a)(2)(B) ............................................................................. 20

19 U.S.C. § 1677e(a)(2)(C) ............................................................................. 20

19 U.S.C. § 1677e(b)(1) ............................................................................15, 21

19 U.S.C. § 1677e(c)(1) .................................................................................. 23

19 U.S.C. § 1677e(d)(1)(A)(i) ...................................................................22, 23

**Regulations**

19 C.F.R. § 351.301(c)(1) ........................................................................10, 12

19 C.F.R. § 351.104(a)(2) ............................................................................. 12

19 C.F.R. § 351.506(b)................................................................................. 16

19 CFR § 351.504(b)..................................................................................... 15


**Other Authorities**

*Oil Country tubular Goods From The Republic of Korea and the Russian Federation*,
86 Fed. Reg. 60, 210 (Dept. of Commerce Nov. 1, 2021) ........................... 3

*Oil Countey Tubular Goods From The Republic of Korea*,
87 Fed. Reg. 14, 248 (Dept. of Commerce Mar. 14, 2022)........................ 4

*Large Diameter Welded Pipe from the Republic of Korea,*
84 Fed. Reg. 6, 369 (Dept. of Commerce Feb. 27, 2019) ............................*6, 16, 21*

*Oil Country Tubular Goods From the Republic of Korea and the Russian* Federation,
87 Fed. Reg. 70, 782 (Dept. of Commerce Nov. 21, 2022) ......................... 7

*Oil Country Tubular Goods From the Republic of Korea,*
87 Fed. Reg. 59, 056 ( Dept. of Commerce Sept. 29, 2022) ..............................2, 5, 6

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>BORUSAN MANNESMANN PIPE )<br>U.S. Inc, et al., )<br><br>Defendant-Intervenors. ) | Ct. No. 22-00338 |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION
FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

defendant, the United States, respectfully submits this response in opposition to the motion for

judgment upon the agency record submitted by plaintiff SeAH Steel Corporation (SeAH).  SeAH

challenges certain aspects of final determination of the countervailing duty investigation of oil

country tubular goods from the Republic of Korea.  As we explain below, Commerce's

determination is supported by substantial evidence and in accordance with law.  Accordingly, the

Court should deny the motion and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

I.   **Administrative Determination Under Review**

The administrative determination under review is *Oil Country Tubular Goods from the*

*Republic of Korea*, 87 Fed. Reg. 59,056 (Dep't of Commerce Sep. 29, 2022) (final

determination) (*Final Determination*) (P.R. 382), and accompanying Issues and Decision

Memorandum (IDM) (P.R. 377).  The period of investigation is the calendar year 2020.

## II.     Issues Presented for Review

1.  Whether Commerce reasonably rejected from the record new factual information

    pertaining to SeAH's use of the KEXIM Performance Guarantees program when such

    information should have been included in SeAH's initial questionnaire response and was

    first presented to Commerce at verification.

2.  Whether Commerce's application of facts available to SeAH for its failure to accurately

    and completely respond to Commerce's initial questionnaire, and Commerce's resulting

    selection of a rate as an adverse inference are supported by substantial evidence and in

    accordance with law.

## STATEMENT OF FACTS[1]

On October 5, 2021, Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC,

U. S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing,

Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded

Tube USA, Inc. (collectively, the petitioners) filed a petition with Commerce for the imposition

of countervailing duties on oil country tubular goods from several countries, including Korea.

Petition (Oct. 5, 2021) (P.R. 1-67).  Relevant here, petitioners alleged that the Export-Import

---

[1] SeAH refers to non-record information submitted during verification that Commerce rejected.
*See, e.g.*, SeAH Br. at 27.  SeAH also submits a sworn statement with its brief that is not on the
administrative record.  SeAH Br. at 15 n.40.  By statute, Commerce bases its determinations
upon the record developed during the administrative proceeding.  19 U.S.C. 1516a(b)(1) & (2).
The Court should reject SeAH's invitation to consider non-record information in reviewing
Commerce's determination.

Bank of Korea (KEXIM) conferred countervailable subsidies on Korean exporters *via* performance guarantees, which guarantee payment to the foreign buyers of Korean exports in the event the exporter fails to perform its obligation under the eligible contracts.  Petition Vol. 5 at 20 (Oct. 5, 2021) (P.R. 6).

On October 26, 2021, Commerce initiated a countervailing duty investigation of oil country tubular goods from the Republic of Korea.  *Oil Country Tubular Goods From the Republic of Korea and the Russian Federation*, 86 Fed. Reg. 60,210 (Dep't of Commerce Nov. 1, 2021) (*Initiation Notice*).  Concurrent with the *Initiation Notice*, Commerce placed on the record an initiation checklist, in which Commerce recommended initiating an investigation of the alleged countervailable subsidies provided in the form of KEXIM performance guarantees (herein referred to as the KEXIM Performance Guarantees program).  Initiation Checklist at 13-14 (Oct. 27, 2021) (P.R. 116).

Following initiation, Commerce selected Hyundai Steel Company (Hyundai) and SeAH as mandatory respondents in its investigation.  Respondent Selection Memorandum (Nov. 22, 2021) (P.R. 127).  Commerce issued a questionnaire to SeAH in which Commerce requested that SeAH complete the questions in Commerce's Loan Benchmark and Loan Guarantee Appendix, and provide details regarding all assistance SeAH received *via* KEXIM performance guarantees during the period of investigation.  Initial Questionnaire at Section III at 8 (Nov. 24, 2021) (P.R. 129).  In response, SeAH stated that it and its parent company "did not have any performance guarantees from KEXIM for loans that were outstanding during the investigation period."  SeAH Initial Questionnaire Response at 27 (Jan. 10, 2022) (P.R. 168).  SeAH self-reported several other subsidies, but did not report any additional benefit from KEXIM performance guarantees. *Id.* at 52-61.

On March 9, 2022, Commerce preliminarily determined that SeAH did not use KEXIM performance guarantees during the period of investigation. *Oil Country Tubular Goods From the Republic of Korea*, 87 Fed. Reg. 14,248 (Dep't of Commerce Mar. 14, 2022) (prelim. determination) (*Preliminary Determination*). Commerce also preliminarily calculated an estimated subsidy rate of zero for SeAH and 0.17 for Hyundai, and it disregarded Hyundai's rate as *de minimis* pursuant to 19 U.S.C. § 1671b(b)(4). *Preliminary Determination*, 87 Fed. Reg. at 14,248. Commerce therefore preliminarily determined that countervailable subsidies were not provided to producers and exporters of oil country tubular goods from Korea. *Id.* Commerce stated in its preliminary determination its intent to verify the information received during its investigation, which it would rely on to make its final determination. *Id.* at 14,249.

Commerce scheduled its verification of SeAH's questionnaire responses for August 22, 2022 through August 25, 2022, and issued an agenda outlining the information that Commerce would be verifying. Verification Agenda (Aug. 9, 2022) (P.R. 332). Commerce notified SeAH that it would be verifying its non-use of certain programs, and would review documentation confirming non-use of those programs, including the KEXIM Performance Guarantee program. *Id.* at 6-8. Commerce also explained that it would only accept new factual information in the form of minor corrections to SeAH's questionnaire responses at verification, and stipulated that minor corrections must "corroborate, support, and clarify factual information already on the record." *Id.* at 2.

On September 9, 2022, Commerce issued the verification report, memorializing the events and result of SeAH's verification. SeAH Verification Report (Sep. 9, 2022) (P.R. 345). At verification, Commerce found that SeAH provided documentation that demonstrated that SeAH had a KEXIM performance guarantee outstanding during the period of investigation. *Id.*

at 9-10.  SeAH officials explained that SeAH did not report the performance guarantee prior to verification because "the guarantee related solely to non-subject merchandise sold to a third country and, further, both the purchase order and KEXIM agreement were made in 2019." *Id.* at 10.  Commerce did not accept this documentation for placement on the record because it constituted new factual information.  *Id.*

Prior to Commerce's *Final Determination*, SeAH filed three administrative case briefs which Commerce found contained untimely new factual information.  First Case Brief Rejection Letter (Sep. 9, 2022) (P.R. 357); Second Case Brief Rejection Letter (Sep. 13, 2022) (P.R. 363); Third Case Brief Rejection Letter (Sep. 19, 2022) (P.R. 372).  Commerce rejected them from the record, and SeAH filed a fourth case brief without any untimely information.  SeAH Redacted Case Brief (Sep. 20, 2022) (P.R. 374).

In the *Final Determination*, Commerce determined that necessary information regarding SeAH's use of the KEXIM Performance Guarantees program was missing from the record, that SeAH impeded Commerce's investigation, and that SeAH failed to timely respond to Commerce's requests for information, and that as such, Commerce needed to rely on facts available to fill the gap on the record.  IDM at 6-7.  Commerce further determined that SeAH failed to cooperate to the best of its ability in responding to Commerce's request for information and that SeAH's failure warranted an adverse factual inference.  *Id.* at 7.  Therefore, Commerce determined that SeAH used the KEXIM Performance Guarantees program.  IDM at 6-7 and Comment 11.

When Commerce selects rates based on adverse factual inferences, it will first determine whether there is an identical program in the instant investigation, and use the highest rate for that calculated program.  IDM at 7.  Commerce did not find that the other respondent in the

investigation, Hyundai, used the KEXIM Performance Guarantees program. *Id.* at 10. Commerce therefore resorted to the next step in its hierarchy, which is to select a rate calculated for a similar program in another countervailing duty proceeding involving the same country. *Id.* Commerce selected the highest rate calculated for a comparable program to a cooperative company in a Korea countervailing duty proceeding. *Id.* In this case, the selected program was the "K-SURE Export Credit Guarantee program," an export-specific loan guarantee program which Commerce found provided countervailable subsidies to at least one mandatory respondent in its investigation of large diameter welded pipe from Korea. *Id.* (citing *Large Diameter Welded Pipe from the Republic of Korea*, 84 Fed. Reg. 6,369 (Dep't of Commerce Feb. 27, 2019) (final determination) (*LDWP Korea*) and accompanying Issues and Decision Memorandum at Appendix). Using an adverse factual inference, Commerce determined a 1.05 percent *ad valorem* subsidy rate for SeAH's use of the KEXIM Performance Guarantees program. *Id.* Commerce found that the rate derived from the K-SURE Export Guarantee program is relevant to the investigation because it is a rate calculated in a countervailing duty proceeding that is a "program-type match" for, or a similar program to, the KEXIM Performance Guarantees program. *Id.* at 12. Based on this information, Commerce determined that it corroborated the rate selected as an adverse factual inference for the KEXIM Performance Guarantees program to the extent possible. *Id.*

Commerce calculated an *ad valorem* subsidy rate of 1.33 percent for SeAH, and continued to calculate a *de minimis* subsidy rate for Hyundai. *Final Determination*, 87 Fed. Reg. at 59,057. Because the rate calculated for SeAH was the only rate calculated in the *Final Determination* that was not zero, *de minimis*, or based entirely on an adverse factual inference,

Commerce assigned SeAH's rate to all other producers and exporters in accordance with the statute. *Id.*

On November 14, 2022, the United States International Trade Commission (ITC) notified Commerce of its determination that the U.S. industry is materially injured by imports of subsidized oil country tubular goods from Korea. ITC Notification Letter (Nov. 14, 2022) (P.R. 378). On November 21, 2022, based on Commerce's and the ITC's final determinations, Commerce issued the countervailing duty order on oil country tubular goods from Korea. *Oil Country Tubular Goods From the Republic of Korea and the Russian Federation*, 87 Fed. Reg. 70,782 (Dep't of Commerce Nov. 21, 2022).

## SUMMARY OF THE ARGUMENT

Because SeAH should have reported its receipt of a KEXIM performance guarantee which was outstanding during the period of investigation in response to Commerce's initial questionnaire, SeAH's eventual disclosure of usage of the program at verification constituted an untimely questionnaire response, and was properly rejected by Commerce. Commerce requested that SeAH report all assistance that it received in the form of KEXIM performance guarantees during the period of investigation (*i.e.*, 2020). SeAH reported that it did not have any KEXIM-guaranteed loans outstanding during the period of investigation. However, at verification, Commerce discovered that SeAH received a KEXIM performance guarantee in 2019 which was outstanding during the period of investigation. Commerce therefore reasonably rejected the new factual information.

Commerce's application of an adverse inference to calculate a rate for the KEXIM Performance Guarantees program is supported by substantial evidence and in accordance with law. SeAH impeded Commerce's investigation and failed to respond accurately and completely

to a request for information from Commerce, and further, necessary information was missing

from the record where SeAH failed to timely report its receipt of a KEXIM performance

guarantee which remained outstanding during the period of investigation.  These determinations

justified Commerce's resort to facts available.  Because SeAH was in control of the information

that it failed to report, and failed to act to the best of its ability by reporting it, the use of an

adverse inference was also justified.  Commerce's selection of a rate pursuant to an adverse

inference was supported by the statute, as Commerce used a rate calculated from a comparable

program in a prior Korea countervailing duty investigation.

**ARGUMENT**

I.    **Standard Of Review**

The Court sustains Commerce's determination if it is supported by "substantial evidence

on the record" and otherwise "in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to

support the underlying conclusions.  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts

from the substantiality of the evidence."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562

(Fed. Cir. 1984) (footnote and internal quotation marks omitted).

That the Court may draw two inconsistent conclusions from the record "does not prevent

an administrative agency's finding from being supported by substantial evidence."  *Consolo v.*

*Fed. Mar. Comm'n*, 383 U.S. 607 (1966) (citation omitted).  Rather, when Congress has

entrusted an agency to administer a statute that demands inherently fact intensive inquiries, such

as in this case, the agency's conclusions may be set aside only if the record contains evidence "so

compelling that no reasonable factfinder" could reach the same conclusion.  *See INS v. Elias-*

8

*Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

**II.     Commerce Properly Rejected New Factual Information Related To SeAH's Use Of The KEXIM Performance Guarantees Program That SeAH Presented To Commerce For The First Time At Verification**

Because SeAH should have reported its usage of the KEXIM Performance Guarantees program in response to Commerce's initial questionnaire, SeAH's eventual disclosure of such information at verification was an untimely questionnaire response, and Commerce's determination not to accept that untimely information was supported by substantial evidence and in accordance with law.  IDM at 71.

Commerce has "broad discretion to fashion its own rules of administrative procedure, including the authority to establish and enforce time limits concerning the submission of written information and data." *Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 237 (Ct. Int'l Trade 1999) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 544-45 (1978)). As Commerce explained in its verification agenda to SeAH, verification is "not intended to be an opportunity for the submission of new factual information," and minor corrections presented at verification are only accepted to "corroborate, support, and clarify factual information already on the record." *See* Verification Agenda at 2 (Aug. 9, 2022) (P.R. 332).  This practice comports with the purpose of verification, which is to "test information provided by a party for accuracy and completeness." *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1509 (Ct. Int'l Trade 1990); *see also Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020) ("{V}erification is not an opportunity for a do-over; instead, the purpose of verification is

to confirm information previously submitted by a respondent in response to Commerce's requests for information.").

At verification, SeAH provided documentation indicating that SeAH received a KEXIM performance guarantee which was outstanding during the period of investigation, which should have been reported in response to Commerce's initial questionnaire.  SeAH Verification Report (Sep. 9, 2022) (P.R. 345).  Commerce declined to accept the information presented by SeAH pertaining to its usage of the KEXIM Performance Guarantees program at verification, and only memorialized the fact that SeAH received a performance guarantee which was outstanding during the period of investigation, finding that it "constituted new factual information."  *Id.* at 10.  In the *Final Determination*, Commerce classified the information as an untimely questionnaire response, which Commerce may not consider pursuant to its regulations.  IDM at 74 (citing 19 C.F.R. § 351.301(c)(1) ("{Commerce} will not consider or retain in the official record of the proceeding…untimely filed questionnaire responses.")).  Given Commerce's discretion to establish and enforce administrative deadlines, and its well-known admonition that verification is not intended to be a fact-gathering exercise, Commerce's determination not to accept SeAH's documentation was reasonable.

SeAH argues that the information presented at verification was specifically requested by Commerce and that Commerce was therefore required to accept it as record information.  SeAH Br. at 23-25.  SeAH misunderstands the purpose of Commerce's verification, and Commerce's discretion over verification procedures.  The purpose of Commerce's verification is to "confirm information previously submitted by a respondent in response to Commerce's requests for information."  *Hung Vuong*, 483 F. Supp. 3d at 1349.  For this reason, Commerce stipulated in its verification agenda:

> Information will be accepted at verification only when the
> information makes minor corrections to information already on the
> record or when information is requested by the verifiers, in
> accordance with the agenda below, to corroborate, support, and
> clarify factual information already on the record.

Verification Agenda at 2 (Aug. 9, 2022) (P.R. 332).  The information provided by SeAH at

verification did not "corroborate, support, {or} clarify" information already on the record.

Rather, it presented new evidence that contradicted information SeAH had already reported,

indicating that SeAH had not used the program.  Therefore, Commerce's determination to reject

the information provided by SeAH was an appropriate exercise of Commerce's discretion.

> This Court's holding in *CITIC Trading*, as replied upon by SeAH, is inapplicable.  SeAH

Br. at 25.  In that case, the Court held that "{u}ntimeliness alone…will not necessarily bar the

admission of new information during verification," and found that Commerce has accepted new

factual information at verification when such information was provided for the purposes of

support, corroboration, and clarification.  *CITIC Trading Co. v. United States*, 27 C.I.T. 356, 373

(Ct. Int'l Trade 2003).  But the fact that SeAH received a KEXIM performance guarantee in

2019 which was still outstanding during the period of investigation only served to contradict, not

corroborate, its reporting.  Contrary to SeAH's argument, this Court has also held that

respondents cannot, at verification, attempt to "fill gaps in the record caused by {respondent's}

own failure to respond fully to Commerce's questionnaires."  *Guizhou Tyre Co. v. United States*,

523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021).

> SeAH contends that even if Commerce rejected from the record the information

regarding the KEXIM Performance Guarantees program that SeAH provided at verification, such

information should still be considered part of the agency record.  SeAH Br. at 26-27.  The

agency record is defined as "all information presented to or obtained by {Commerce} during the

course of the administrative proceeding." 19 USC § 1516a(b)(2)(A)(i). However, "Commerce

may exclude certain documents from the record," including documents rejected from the record

as untimely filed. *Hyundai Elec. & Energy Sys. v. United States*, 477 F. Supp. 3d 1324, 1330

(Ct. Int'l Trade 2020); *see also Acciai Speciali Terni*, 120 F. Supp. 2d at 1103-4 ("Commerce

regulations limit the definition of the record by excluding material returned to the respondent as

untimely{.}") (citing 19 C.F.R. § 351.104(a)(2)).

Here, Commerce rejected the information provided by SeAH at verification as an

untimely questionnaire response. IDM at 72. Therefore, Commerce did not consider that

information, except to establish that SeAH had a KEXIM performance guarantee outstanding

during the period of investigation – a fact that Commerce summarized in its verification report.

SeAH Verification Report at 9 (Sep. 9, 2022) (P.R. 345). That information in Commerce's

verification report is sufficient to establish that SeAH reported an untimely questionnaire

response, and constitutes substantial evidence to support Commerce's determination to disallow

that information from becoming part of the administrative record. Therefore, Commerce's

exercise of discretion, pursuant to 19 C.F.R. § 351.301(c)(1), to reject SeAH's untimely

questionnaire response from the agency record, was reasonable and supported by Commerce's

regulations.

Following SeAH's argument to its logical end, SeAH would have the agency record

include all information presented to the agency, regardless of whether that information was

timely filed. This interpretation of the statute cannot prevail because it does not comport with

Commerce's "authority to establish and enforce time limits," particularly where, as here,

Commerce specifically stated that new factual information would not be accepted. *See Am.

Brake Drum*, 44 F. Supp. 2d at 237; *see also* Verification Agenda at 2 (Aug. 9, 2022) (P.R. 332).

Finally, SeAH contends that the information it presented at verification should have been accepted in its case briefs, which Commerce rejected.  First Case Brief Rejection Letter (Sep. 9, 2022) (P.R. 357); Second Case Brief Rejection Letter (Sep. 13, 2022) (P.R. 363); Third Case Brief Rejection Letter (Sep. 19, 2022) (P.R. 372).  Among the documents SeAH filed along with its case brief is a sworn statement from its accountant, which SeAH  claims "simply described what was actually presented and discussed at the verification."  SeAH Br. at 29.  But by describing the events of verification, SeAH introduces the same factual information which Commerce rejected, and usurps Commerce's congressionally-delegated responsibility to report the findings of verification.  *See* SAA at 868 (requiring Commerce to "report the methods, procedures, and results of the verification prior to making its final determination in an investigation").  The remainder of the information included in SeAH's case brief entailed the same factual information related to SeAH's receipt of a KEXIM performance guarantee which Commerce rejected at verification, and which Commerce again found to be untimely factual information included in SeAH's case briefs.  First Case Brief Rejection Letter (Sep. 9, 2022) (P.R. 357); Second Case Brief Rejection Letter (Sep. 13, 2022) (P.R. 363); Third Case Brief Rejection Letter (Sep. 19, 2022) (P.R. 372).

### III.    Commerce's Application Of Facts Available With An Adverse Inference Is Supported By Substantial Evidence And In Accordance With Law

Commerce reasonably applied facts available with an adverse inference with respect to the KEXIM Performance Guarantees program because SeAH failed to disclose its usage of the program in response to Commerce's initial questionnaire.  Specifically, Commerce found that SeAH should have reported the outstanding KEXIM performance guarantee in response to Commerce's initial questionnaire.  SeAH contends that it fully responded to Commerce's initial questionnaire, and that it presented the new factual information at verification to support its

response that it had not received any KEXIM performance guarantees during the investigation period. *See generally* SeAH Br. As we demonstrate below, Commerce properly found that SeAH failed to respond to Commerce's initial questionnaire fully and accurately, and that such failure reasonably led to the application of facts available with an adverse inference.

### A. Legal Framework

Commerce will use facts otherwise available to fill gaps in the record if (1) necessary information is not available or (2) an interested party withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified. 19 U.S.C. § 1677e(a). If Commerce finds that a respondent "failed to cooperate by not acting to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available. 19 U.S.C. § 1677e(b)(1).

"While the {best of its ability} standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). To comply with the 'best of its ability' standard, a producer must maintain access to information so long as such information is the sort of information a reasonable producer would have known was required to be maintained. *Peer Bearing Co. v. United States*, 766 F.3d 1396, 1400 (Fed. Cir. 2014).

### B. SeAH Failed To Disclose Its Usage Of KEXIM Performance Guarantees In Response To Commerce's Initial Questionnaire

In its initial questionnaire, Commerce requested that SeAH report information regarding KEXIM performance guarantees for loans that were either received in or outstanding during the

14

period of investigation (*i.e.*, 2020).  Initial Questionnaire at Section III at 8, 24 (Nov. 24, 2021)

(P.R. 129).  Commerce also requested that SeAH report whether it received any benefit from the

government of Korea during the average useful life period, which, for this investigation runs

from 15 years before the period of investigation through the end of the period of investigation.

Initial Questionnaire, Section I at 17 (Nov. 24, 2021) (P.R. 129).  SeAH reported only that it did

not receive performance guarantees for loans that were outstanding during the period of

investigation.  SeAH Initial Questionnaire Response at 27 (Jan. 10, 2022) (P.R. 168).

At verification, SeAH disclosed its receipt of a performance guarantee that remained

outstanding during the period of investigation.  *See* SeAH Verification Report at 9-10 (Sep. 9,

2022) (P.R. 345).  Commerce found, based on the documentation provided by SeAH at

verification, that SeAH failed to report its usage of the KEXIM Performance Guarantees

program in response to Commerce's initial questionnaire.  IDM at 71.

SeAH argues that Commerce only requested information regarding the KEXIM

Performance Guarantees program received by SeAH during the period of investigation.  SeAH

Br. at 21.  SeAH's argument is unsupported by the text of Commerce's questionnaire.

Commerce requested information "regarding all assistance that your company received under

{the KEXIM Performance Guarantees program} during the {period of investigation}."  Initial

Questionnaire at Section III at 8 (Nov. 24, 2021) (P.R. 129).  The fact that SeAH received a

performance guarantee in 2019, as SeAH claims, did not relieve it of its affirmative obligation to

report the guarantee because the performance guarantee would have been received during the

average useful life period, and in any case was outstanding during the period of investigation,

both of which make this information that Commerce solicited in its initial questionnaire.  While

Commerce did not explicitly explain when it considers assistance under the KEXIM

Performance Guarantees program to be received, Commerce classified the program as a loan guarantee, which is considered received at the time of repayment, not receipt, of the loan.[2] *See* 19 C.F.R. § 351.506(b); Initial Questionnaire, Section III at 8 (Nov. 24, 2021) (P.R. 129). Further, as evidenced by the Loan Benchmark and Loan Guarantee Appendix to Commerce's initial questionnaire, Commerce requests information pertaining to "all loans on which principal was outstanding or on which interest was paid, accrued, and/or waived during the {period of investigation}" (for short term loans), and "all loans with principal or interest outstanding during the {period of investigation} or for any such loans forgiven or assumed" (for long term loans). Initial Questionnaire, Section III at 24 (Nov. 24, 2021) (P.R. 129). Therefore, even if the KEXIM performance guarantee received by SeAH was not in the form of a loan guarantee, the manner in which Commerce classified the program should have indicated to SeAH that the request pertained to performance guarantees outstanding during the period of investigation. Initial Questionnaire, Section III at 24.

Further, even if SeAH had believed that its receipt of a performance guarantee prior to the period of investigation was not responsive to Commerce's direct question regarding the program, Commerce also requested that SeAH report any benefit received from the government of Korea during the average useful life period, which consists of a 15-year period prior to 2020. Initial Questionnaire, Section I at 17 (Nov. 24, 2021) (P.R. 129). SeAH contends that Commerce's question regarding "other subsidies" received by SeAH applies only to subsidies "not specifically alleged in the petition or questionnaire." SeAH Br. at 35-37. But, as

---

[2] By contrast, grant programs are considered received on the date on which the firm received the grant. 19 CFR § 351.504(b). Because Commerce investigated the KEXIM Performance Guarantee program as a loan guarantee program, but the performance guarantee reported by SeAH was not in the form of a loan, it is unclear from the record the manner in which Commerce would have classified SeAH's use of this program pursuant to its regulations.

Commerce explained in the *Final Determination*, Commerce's question regarding "other subsidies" is only relevant to the extent that SeAH believed that Commerce's direct question regarding the KEXIM Performance Guarantees program was unclear.  IDM at 71.  In other words, if SeAH believed its receipt of a performance guarantee was not responsive to Commerce's question regarding that program, Commerce's question regarding "other subsidies" clarifies that Commerce requires information pertaining to all benefits received during the average useful life period.  Commerce's request for information pertaining to "other subsidies" is fundamental to Commerce's statutory mandate to investigate and catalogue all potentially countervailable subsidies, and "to consolidate all relevant subsidies into a single investigation." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1150 n.12 (Ct. Int'l Trade 2000); *see also* 19 U.S.C. § 1677d (concerning subsidies discovered during a proceeding, Commerce "*shall* include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding" (emphasis added)).

SeAH argues that Commerce should have sought additional information regarding its use of the KEXIM Performance Guarantees program via supplemental questionnaires.  SeAH Br. at 21-22 (citing *Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1387 (Ct. Int'l Trade 2019)).  In *Jindal Poly*, the Court held that Commerce was required to permit a respondent to amend its deficient reporting where Commerce was aware of such deficiencies and where the respondent made several efforts to clarify the scope of Commerce's request for information.  *Jindal Poly*, 365 F. Supp. 3d at 1387 (Ct. Int'l Trade 2019) ("Commerce was the only party that could have been aware of the deficiency in the questionnaire response because it was the only participant in the review that knew what would satisfy its unarticulated criteria").

17

*Jindal Poly* is distinguishable in two regards: first, SeAH made no effort to clarify the scope of Commerce's request for information pertaining to the KEXIM Performance Guarantees program; and second, Commerce could not have been aware of the fact that SeAH's reporting was incomplete because SeAH failed to acknowledge that it used the KEXIM Performance Guarantees program at all.

SeAH also relies upon this Court's holding in *Ta Chen*, arguing that it did not have notice of Commerce's request for information regarding the program where Commerce did not "specifically request" information regarding the program. SeAH Br. at 31-32 (citing *Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804, *12-*13 (1999)). However, *Ta Chen* involved an antidumping duty investigation in which Commerce failed to notify a respondent of its request for certain information needed to make an affiliation determination. Those facts are distinguishable from the present case, where Commerce notified the respondent of a need for information pertaining to assistance received under the KEXIM Performance Guarantees program, and also notified the respondent of the requirement to report all other subsidies and benefits received therefrom. Initial Questionnaire, Section III at 8 and Section I at 17 (Nov. 24, 2021) (P.R. 129). Commerce's direct question regarding KEXIM performance guarantees in conjunction with Commerce's question regarding "other subsidies" received during the average useful life period, should have made SeAH aware of its obligation to report its receipt of a performance guarantee which was still outstanding during the period of investigation.

Finally, SeAH analogizes Commerce's request for information regarding grant programs to its request for information regarding KEXIM performance guarantees, which Commerce categorized as a loan program. SeAH Br. at 21-22. SeAH also identifies the fact that Commerce issued supplemental questionnaires to SeAH ascertaining whether certain grant programs were

used during the 15-year average useful life period. *Id.* Commerce initiated an investigation on

the program as a loan guarantee and characterized it as such in its initial questionnaire. Initiation

Checklist at 13-14 (Oct. 27, 2021) (P.R. 116); Initial Questionnaire, Section III at 8 (Nov. 24,

2021) (P.R. 129). However, the information provided by SeAH at verification indicated that it

received a KEXIM performance guarantee in a form other than that of a loan guarantee. SeAH

Verification Report (Sep. 9, 2022) (P.R. 345). Therefore, it is unclear from the record under

what program SeAH received the performance guarantees. Commerce found that it lacked the

time necessary to investigate the program because SeAH failed to report it initially, and

Commerce only discovered the benefit from the program at verification. IDM at 73.

Commerce's finding illustrates the difficulty that respondents create for the agency by

substituting their judgment for that of Commerce. *See Hyundai Heavy Indus. v. United States*,

399 F. Supp. 3d 1305, 1312 (Ct. Int'l Trade 2019) (sustaining Commerce's use of an adverse

factual inference where respondent "selectively reported what it considered necessary and

sufficient") (quotations removed). Based on its argument, SeAH suggests that the KEXIM

Performance Guarantees program is a grant program, and on that basis should not have been

reported. But because Commerce categorized the KEXIM Performance Guarantees program as a

loan program, SeAH should have at least indicated to Commerce its usage of the program, even

if SeAH believed it was a grant. Instead, SeAH failed to report its usage of the KEXIM

Performance Guarantees program at all, leaving Commerce with inadequate time to evaluate the

program and with a gap in the record evidence, and warranting the application of a factual

inference.

**C.    Commerce's Determination That SeAH Withheld Information, Significantly Impeded The Review, And Did Not Act To The Best Of Its Ability Is Supported By Substantial Evidence**

Commerce found, pursuant to 19 U.S.C. § 1677e(a)(1), that necessary information regarding SeAH's use of the KEXIM Performance Guarantees program was missing from the record.  IDM at 6.  Commerce also found, pursuant to 19 U.S.C. §§ 1677e(a)(2)(B) and (C), that SeAH failed to provide a complete response to Commerce's initial questionnaire with respect to the KEXIM Performance Guarantees program, and that SeAH significantly impeded Commerce's investigation by "replacing its discretion for that of Commerce and preventing {Commerce} from fully investigating this program and the use, or lack thereof, by SeAH{}." *Id.* Commerce further found, pursuant to 19 U.S.C. § 1677e(b)(1), that SeAH failed to cooperate to the best of its ability in providing information requested by the agency by failing to provide Commerce with information regarding its usage of the KEXIM Performance Guarantees program even though such information was in SeAH's control at the time the information was requested and SeAH had the ability to report such information.  IDM at 7.

Commerce's use of an adverse factual inference selecting from among the facts otherwise available to determine whether SeAH used the KEXIM Performance Guarantees program is supported by substantial evidence and in accordance with law.  Commerce's verification report shows that SeAH's initial questionnaire response was incomplete, and Commerce rejected new factual information pertaining to the program from the record.  SeAH Verification Report at 10 (Sep. 9, 2022) (P.R. 345).  The same evidence supports a finding that SeAH failed to respond to Commerce's initial questionnaire completely and fully by the deadline provided, pursuant to 19 U.S.C. § 1677e(a)(2)(B).

Commerce's determination to use an adverse inference is otherwise supported by the record.  Commerce found that SeAH had the access to and familiarity with its records that would have enabled it to report its usage of the KEXIM Performance Guarantees program in response to Commerce's initial questionnaire.  IDM at 7.  SeAH does not attempt to rebut this finding, but instead continues to argue that Commerce did not request information pertaining to performance guarantees received prior to the period of investigation.  SeAH Br. at 30-34.

Commerce's determination to use an adverse inference is further supported by SeAH's selective reporting in response to Commerce's requests for information.  Commerce's verification report indicates that SeAH did not report its usage of the KEXIM Performance Guarantees program during the period of investigation because "the guarantee related solely to non-subject merchandise sold to a third country and, further, both the purchase order and KEXIM agreement were made in 2019."  SeAH Verification Report at 10 (Sep. 9, 2022) (P.R. 345).  Yet, as discussed above, the information withheld by SeAH was nonetheless information that Commerce requested in its initial questionnaire.  Therefore, the record shows that SeAH substituted its judgment for that of Commerce with respect to which information is necessary for Commerce to complete its investigation, effectively impeding Commerce's review, and warranting the application of a factual inference.

As Commerce explained in the *Final Determination*, even though SeAH may have believed that its usage of the KEXIM Performance Guarantees program was ancillary to Commerce's investigation, SeAH was not relieved from its obligation to report such information. IDM at 73; *see also Guizhou Tyre*, 523 F. Supp. 3d 1312 (finding that "{respondent's} contention that information regarding the unalleged grants was not 'necessary' for Commerce's investigation - and, therefore, Commerce's application of {an adverse factual inference} was

21

invalid - is not supported by the statute" ).  Indeed, without the relevant information on the record, Commerce explained that it was unable to assess the merits of SeAH's claims regarding such information.  IDM at 73.

Commerce relies on respondents to provide information regarding the respondents' individual usage of a program.  *See Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1297 (Ct. Int'l Trade 2010).  If SeAH, based on its first-hand knowledge of the program, believed that its receipt of a performance guarantee did not provide it a benefit during the period of investigation, it should have either sought clarification from Commerce, or reported it as an "other subsidy" received during the average useful life.  Instead, SeAH unilaterally determined that its receipt of a performance guarantee did not provide a countervailable benefit during the period of investigation.  *See* SeAH Verification Report at 10 (Sep. 9, 2022) (P.R. 345). Commerce found that by substituting its judgment for that of Commerce, SeAH "supplanted the role of Commerce to determine what information is relevant to Commerce's analysis."  IDM at 72.  The Court has previously found that selective reporting on the part of respondents justifies the use of adverse factual inferences.  *See Hyundai*, 399 F. Supp. 3d at 1312; *POSCO v. United States*, 353 F. Supp. 3d 1357, 1375 (Ct. Int'l Trade 2018).  Therefore, Commerce's use of an adverse factual inference based on SeAH's failure to report information which was in its control pertaining to its use of the KEXIM Performance Guarantees program is supported by substantial evidence and in accordance with relevant precedent.

Finally, SeAH argues that Commerce failed to corroborate the rate selected as an adverse factual inference. SeAH Br. at 44-46.  When selecting from the facts available based on an adverse inference, Commerce may "use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country."  19 U.S.C. §

1677e(d)(1)(A)(i); *see also Essar Steel Ltd. v. United States*, 753 F.3d 1368, 1373-74 (Fed. Cir. 2014) (upholding "hierarchical methodology for selecting an AFA rate").  Commerce's finding comports with the statute because it selected the rate calculated for a separate export-specific loan guarantee program which Commerce examined in its investigation of large diameter welded pipe from Korea.  IDM at 12 (citing *LDWP Korea* Issues and Decision Memorandum at Appendix).  SeAH does not challenge Commerce's application of 19 U.S.C. § 1677e(d)(1)(A)(i) to select a rate as an adverse factual inference, and relies solely on non-record information to argue that the rate selected by Commerce is uncorroborated and punitive.  SeAH Br. at 44-46. But, as Commerce explained, even though the record lacked evidence with respect to the KEXIM Performance Guarantee program, the rate which Commerce selected, in accordance with its selection hierarchy, was based on an actual calculated countervailing duty rate for a similar Korean program and was therefore corroborated to the extent practicable in this proceeding. IDM at 11.  SeAH's contention that the margin selected by Commerce overstates the benefit which it received from performance guarantees is unavailing.  SeAH Br. at 44-46.  Commerce is not required to estimate what the countervailable subsidy would have been had SeAH cooperated with Commerce's requests for information.  19 U.S.C. § 1677e(c)(1).  SeAH does not otherwise dispute Commerce's use of an adverse factual inference to find usage of the KEXIM Performance Guarantees program, and Commerce's determination is supported by substantial evidence.

### D.    Commerce Properly Did Not Consider SeAH's Argument That The KEXIM Performance Guarantee Did Not Provide A Countervailable Benefit

SeAH argues that the information that SeAH presented at verification demonstrates that "SeAH did not receive any KEXIM performance guarantees during the investigation period" and that the KEXIM performance guarantee did not benefit SeAH's exports of OCTG to the United

States because it related to third-country sales.  SeAH Br. at 37-40.  Because Commerce

reasonably rejected the information SeAH relies upon, SeAH's arguments are unsupported by

the record.  SeAH's failure to provide the requested information in response to Commerce's

initial questionnaire in a timely manner prevented Commerce from gathering the necessary

information to analyze the program without the use of facts available.  IDM at 73 ("While SeAH

Steel claims the performance guarantee is related to third-country sales, we are unable to assess

the merits of that claim without information on the record regarding the guarantee or the related

sales, information that was within SeAH Steel's control, information that SeAH Steel withheld,

and that SeAH Steel could have timely placed on the record in response to our initial

questionnaire.").  Thus, Commerce properly concluded that SeAH's "arguments in this regard

are moot."  *Id.* at 75.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiff's motion

for judgment upon the agency record and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Claudia Burke
CLAUDIA BURKE
Deputy Director

OF COUNSEL:

/s/Hardeep K. Josan
HARDEEP K. JOSAN
SPENCER NEFF                          Trial Attorney
Attorney                              Commercial Litigation Branch
Office of the Chief Counsel           Civil Division
    for Trade Enforcement & Compliance   U.S. Department of Justice
U.S. Department of Commerce           26 Federal Plaza, Suite 346
                                      New York, New York 10278
                                      Tel.: (212) 264-9245
                                      Fax:  (212) 264-1916
May 16, 2023                          Email: hardeep.k.josan@usdoj.gov

25

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 6,800 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

 /s/ Hardeep K. Josan
Hardeep K. Josan
Trial Attorney
Department of Justice
Civil Division
