UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION,<br><br>     Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>  and<br><br>BORUSAN MANNESMANN PIPE<br>U.S. INC., ET AL.,<br><br>     Defendant-<br>     Intervenors. | Court No. 22-00338 |

REPLY BRIEF OF SEAH STEEL CORPORATION

PUBLIC DOCUMENT

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

June 27, 2023

Table of Contents

Page

ARGUMENT .................................................................................................................. 1

    A.    Defendant's Assertion that Commerce's Initial
            Questionnaire Explicitly Requested Information
            on the KEXIM Performance Guarantee
            Received by SeAH in 2019 Is Demonstrably False .............................................. 6

          1.    The Questionnaire Only Requested Information
                on KEXIM Performance Guarantees that
                Were Received During the Investigation Period ........................................... 6

          2.    Defendant's Proposed Interpretation Is
                Contrary to Commerce's Actual Determination
                and to the Language of the Questionnaire ..................................................... 8

          3.    Contrary to Defendant's Claim, Commerce's Initial
                Questionnaire Did Not Instruct SeAH to Report
                "Benefits" Received During the Investigation Period ................................. 11

    B.    Defendant's Argument that Information on KEXIM
            Performance Guarantees Received Prior to the Investigation
            Period Must Be Reported as an "Other Subsidy" is Unfounded ......................... 13

    C.    Defendant-Intervenor's Claim that SeAH Failed
            to Supply a Requested Financial Statement in a
            Timely Manner Is a Post Hoc Rationalization
            that Is Unsupported by Record Evidence ........................................................... 15

    D.    Commerce's Rejection of the Materials
            Presented at Verification Was Unlawful ........................................................... 17

    E.    Commerce's Determination that Application
            of Facts Available with an Adverse Inference
            Was Warranted Due to SeAH's Alleged Failure
            to Act to the Best of Its Ability Was Unsupported
            by Substantial Evidence and Contrary to Law ................................................... 18

    F.    Commerce Did Not Satisfy its Statutory Burden to Provide an
            Opportunity to Correct Deficiencies in Reported
            Information Before Applying Facts Available to SeAH ..................................... 21

          1.    Commerce Is the Only Party that Knew the
                Information it Needed and Could Have Requested
                Additional Information on the Program ..................................................... 21

Page

2.   SeAH Was Not Required to Seek Clarification
     from Commerce About its Request for Information ................................. 23

3.   Questions in Commerce's Initial Questionnaire
     Do Not Satisfy the Statutory Requirement to Notify
     SeAH of Purported Deficiencies in Its Response...................................... 23

CONCLUSION ............................................................................................................... 24

Table of Authorities

Page

COURT ADMINISTRATIVE DETERMINATIONS

*Allegheny Ludlum Corp. v. United States,*
  24 C.I.T. 452 (2000) ................................................................. 15

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S.,*
  222 F. Supp. 3d 1255 (CIT 2017) ........................................ 12, 17

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962) ............................................................... 9, 17

*Essar Steel Ltd. v. United States,*
  34 C.I.T. 1057 (2010) ................................................................ 20

*Guizhou Tyre Co. v. United States,*
  523 F. Supp. 3d 1312 (CIT 2021) .................................... 14, 15, 21

*Hyundai Heavy Indus., Co. v. United States,*
  399 F. Supp. 3d 1305 (CIT 2019) ............................................. 20

*JSW Steel Ltd. v. United States,*
  315 F. Supp. 3d 1379 (CIT 2018). ........................................ 19, 21

*Max Fortune Indus. Ltd. v. United States,*
  36 C.I.T. 964 (2012) .................................................................. 23

*Olympic Adhesives, Inc. v. United States,*
  899 F.2d 1565 (Fed. Cir. 1990) ........................................... 13, 24

*Peer Bearing Co.-Changshan v. United States,*
  36 C.I.T. 1115 (2012) .................................................................. 5

*POSCO v. United States,*
  353 F. Supp. 3d 1357 (CIT 2018) .............................................. 20

*Queen's Flowers de Colombia v. United States,*
  981 F.Supp. 617 (CIT 1997) ....................................................... 6

*SKF USA Inc. v. United States,*
  29 CIT 969 (2005) ...................................................................... 20

*Ta Chen Stainless Steel Pipe v. United States,*
  23 C.I.T. 804 (1999) ................................................................... 11

Page

STATUTES AND REGULATIONS

19 C.F.R. § 351.311(b) ................................................................. 15

19 C.F.R. § 351.520 ..................................................................... 13

19 C.F.R. § 351.524(b)(1)-(2) ...................................................... 16

19 U.S.C. § 1677e(a) .................................................................... 22


ADMINISTRATIVE DETERMINATIONS

*Final Affirmative Countervailing Duty Determination;*
    *Oil Country Tubular Goods from Spain*,
    49 Fed. Reg. 47060 (Nov. 30, 1994) ....................................... 12

*Final Determination In the Countervailing Duty Investigation*
    *of Large Residential Washers from the Republic of Korea*,
    77 Fed. Reg. 75975 (Dec. 26, 2012) ....................................... 13

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION,        ) | |
|       ) | |
|       Plaintiff,   ) | |
|       ) | |
| v.       ) | |
|       ) | |
| UNITED STATES,       ) | |
|       ) | Court No. 22-00338 |
|       Defendant,   ) | |
|       ) | |
| and       ) | |
|       ) | |
| BORUSAN MANNESMANN PIPE   ) | |
| U.S. INC., ET AL.,       ) | |
|       ) | |
|       Defendant-   ) | |
|       Intervenors.  ) | |
|       ) | |

<u>REPLY BRIEF OF SEAH STEEL CORPORATION</u>

This brief is submitted on behalf of SeAH Steel Corporation ("SeAH") to address the arguments raised by Defendant and Defendant-Intervenors in their briefs responding to SeAH's Rule 56.2 brief.

<u>ARGUMENT</u>

These are the undisputed facts of the case:

- ▪ Commerce selected SeAH as one of the mandatory respondents for the countervailing duty investigation on Oil Country Tubular Goods ("OCTG") from Korea.[1]

---

[1] *See* Commerce's November 24, 2021, Respondent Selection Memorandum (PR-127, CR-88).

▪   Commerce issued its initial questionnaire on November 24, 2021, which requested that SeAH respond to Section III of the questionnaire.[2]

▪   Section III of the initial questionnaire requested, *inter alia*, that SeAH "provide details regarding all assistance that your company *received* under {the KEXIM-Performance-Guarantee} program during the POI."[3]

▪   SeAH did not receive any performance guarantees from KEXIM during the investigation period (*i.e.*, calendar year 2020).  Accordingly, SeAH correctly informed Commerce that it "did not have any performance guarantees from KEXIM for loans that were outstanding during the investigation period."[4]

▪   Commerce did not ask for any additional information for the KEXIM-Performance-Guarantee program in its supplemental questionnaires to SeAH.

▪   Commerce conducted an on-site verification of SeAH.  The "agenda" issued by Commerce for the verification stated that SeAH should "provide all appropriate source records to substantiate the completeness and accuracy of the information in the responses, including... non-use of programs," and specifically asked SeAH to demonstrate "non-use" of the KEXIM-Performance-Guarantee program.[5]  The verification agenda also stated that to verify "non-use," Commerce would examine all notes to SeAH's audited financial statements for the investigation

---

[2] *See* Commerce's November 24, 2021, Initial Questionnaire (hereinafter "Initial Questionnaire"), Section I at 1 (PR-129).

[3] *See id.* at 8.

[4] *See* SeAH's January 10, 2022, Response at 27 (PR-168, CR-136).

[5] *See* Verification of SeAH's Questionnaire Responses, Verification Agenda (August 8, 2022) at 6-7 (hereinafter "SeAH Verification Agenda") (PR-332).

period (*i.e.*, the 2020 calendar year) and the prior fourteen years corresponding

with the average-useful-life period (*i.e.*, the 2005-2019 calendar years).[6]

- SeAH prepared a package on "non-use" that addressed all of the programs
  identified in the petition that SeAH had not received during the relevant period.
  The materials provided for the KEXIM-Performance-Guarantee program in that
  package demonstrated that SeAH did not receive a guarantee from KEXIM in
  2020.

- SeAH had received a guarantee under the KEXIM-Performance-Guarantee
  program in 2019, that remained outstanding during 2020.[7]  That guarantee was
  not tied to any loans.  Instead, it was received in 2019 for an export sales contract
  of stainless steel pipe to Canada.[8]  In order to demonstrate the accuracy of its
  claim that it had not received KEXIM performance guarantees during the 2020
  investigation period, the materials presented by SeAH at verification identified
  the existence, terms, and amount of the 2019 performance guarantee.  The sole
  purpose of including those materials in the "non-use" package was to explain
  why SeAH had an outstanding KEXIM Performance Guarantee in 2020 despite
  not having *received* any such guarantees during the 2020 investigation period.

- After reviewing the materials presented at verification, Commerce informed
  SeAH that it would not accept the non-use materials presented at verification for

---

[6] *See id.*

[7] *See* September 1, 2022, SeAH Verification Report at 9-10 (hereinafter "Verification Report") (PR-345, CR-265).

[8] *See id.  See also See* SeAH's September 8, 2022, Rejected Case Brief, Attachment 2, Exhibit 1 at 6-9 (PR-353, CR-273).

the KEXIM-Performance-Guarantee program.  In its verification report, Commerce stated that it had asked for information about the KEXIM-Performance-Guarantee program in the initial questionnaire, that SeAH had failed to disclose the existence of the 2019 guarantee in its initial questionnaire response, and that the information presented at verification demonstrating "non-use" of that program was untimely "new factual information."[9]

- In its Final Determination, Commerce stated that it was applying adverse-facts-available for the KEXIM-Performance-Guarantee program, because Commerce asserted that SeAH failed to report "*requested* necessary information" that significantly impeded the proceeding by "replacing its discretion for that of Commerce" preventing Commerce from fully investigating the KEXIM-Performance-Guarantee program.[10]

On these undisputed facts, Commerce's determination to apply adverse-facts-available ("AFA") to SeAH regarding the alleged non-reporting of the KEXIM Performance Guarantee cannot be sustained.  At no time during the investigation did Commerce request that SeAH provide information on KEXIM Performance Guarantees that were received in 2019 but remained outstanding during the 2020 investigation period.  Instead, Commerce explicitly limited the information requested for the KEXIM-Performance-Guarantee program to guarantees "received… during the POI" (*i.e.*, the 2020 calendar year).[11]

---

[9] *See* Verification Report at 9-10.

[10] *See* Issues and Decision Memorandum for the Final Determination of the Countervailing Duty Investigation of Oil Country Tubular Goods from the Republic of Korea (September 23, 2022) at 6 (hereinafter "I&D Memo") (PR-377).

[11] *See* Initial Questionnaire, Section III at 8 (PR-129).

SeAH's questionnaire response for the KEXIM-Performance-Guarantee program was, therefore, complete and fully responsive to Commerce's request for information.  In these circumstances, record evidence does not support Commerce's rejection of the information presented at verification as an *untimely questionnaire response* or that SeAH withheld *requested* information to permit the application of AFA for the KEXIM-Performance-Guarantee program.

This Court's past decisions make clear that Commerce may not apply AFA to punish a respondent for failing to provide information that Commerce did not actually request.  When confronted with such situations, the Court has explained that it "cannot overlook the obvious point that {Commerce's} dissatisfaction with the {respondent's} answers was a result of the narrowly circumscribed manner in which {Commerce} drafted its questions."[12]  In such circumstances, this Court has consistently refused to find that a respondent withheld "requested" information and has rejected Commerce's application of AFA.[13]  Such a result is plainly appropriate in this case as well.  None of the arguments proffered by Defendant or Defendant-Intervenors merit a different result.

---

[12] *Peer Bearing Co.-Changshan v. United States*, 36 C.I.T. 1115, 1129 (2012).

[13] *See id.  See also Queen's Flowers de Colombia v. United States*, 981 F.Supp. 617, 628 (CIT 1997) ("alleged response deficiency cannot support application of {best information available} where the information sought was apparently never requested") (internal citation omitted).

    A.   *Defendant's Assertion that Commerce's Initial*
         *Questionnaire Explicitly Requested Information*
         *on the KEXIM Performance Guarantee*
         *Received by SeAH in 2019 Is Demonstrably False*

        1.   *The Questionnaire Only Requested Information*
             *on KEXIM Performance Guarantees that*
             *Were Received During the Investigation Period*

Defendant asserts that pages 8 and 24 of Commerce's initial questionnaire explicitly requested that SeAH report information on KEXIM Performance Guarantees that were outstanding during the period.  Thus, Defendant claims that:

> In its initial questionnaire, Commerce requested that SeAH report information regarding KEXIM performance guarantees for loans that were either received in *or outstanding during* the period of investigation (i.e., 2020). Initial Questionnaire at Section III at 8, 24 (Nov. 24, 2021) (P.R. 129).[14]

That assertion is, at best, misleading.  While the questionnaire did request information on *loan* guarantees that were related to *loans* that were outstanding during the period, the KEXIM-Performance-Guarantee program described in the questionnaire was not exclusively a loan-guarantee program, and the actual guarantee that SeAH received in 2019 was not a loan guarantee.[15]  For KEXIM Performance Guarantees that were not loan guarantees, the questionnaire's request was limited to guarantees *received* during 2020. There was no request for information on KEXIM Performance Guarantees (other than loan guarantees) that were received in prior years but remained outstanding during 2020.

The section of Commerce's initial questionnaire addressing KEXIM Performance Guarantees was set forth on page 8.  That section *only* requested information on guarantees "received" during the investigation period:

---

[14] Defendant's Brief at 14-15 (emphasis added).

[15] *See* Initial Questionnaire, Initiation Checklist, at 13 (PR-129).  *See also* page 10 below.

6.   Performance Guarantees

Respond to all questions in the Standard Questions Appendix and the
Loan Benchmark and Loan Guarantee Appendix. Complete the Loan
Template and include it as an attachment to your response in electronic
format using Microsoft Excel. Your response should provide details
regarding all assistance that your company *received under this
program during the POI*.[16]

Significantly, the word "outstanding" does not appear anywhere in that question, and there

is no indication that any information concerning guarantees that were received before the

period was required.

Pages 24 to 26 of Section III of the initial questionnaire consisted of a separate Loan

Benchmark and Loan Guarantee Appendix (hereinafter, the "Loan Appendix").  As

mentioned, the section of the questionnaire addressing KEXIM Performance Guarantees

(at page 8 of Section III of the initial questionnaire) instructed SeAH to respond to the

questions in that Appendix.[17]  But the questions in the "Loan Appendix" only requested

information on loans and loan guarantees, and did not have any questions pertaining to

guarantees that were not related to loans.  The *chapeau* of the Appendix stated explicitly

that:

The following information should be given for *loans provided under
the program in question. For short-term loans (one year or less) or
guarantees or insurance on short- term loans*, information must be
provided *for all loans* on which principal was outstanding or on which
interest was paid, accrued, and/or waived during the POI. Please
indicate if any short-term loan program was a line of credit. *For long-
term loans (greater than one year) or guarantees on long-term loans*,
information must be provided *for all loans* with principal or interest

---

[16] *See* Initial Questionnaire, Section III at 8 (emphasis added) (PR-129).

[17] The instructions on page 8 also instructed SeAH to respond to the Standard Questions
Appendix, which appeared at page 19 of Section III of the initial questionnaire.  Nothing in
the Standard Questions Appendix requested information on guarantees that were not
received during the 2020 investigation period.  *See id.* at 19.

outstanding during the POI or for any such loans forgiven or assumed.….[18]

That statement was followed by a series of questions regarding "loan information," "long-term benchmarks" (explicitly for "long-term loans"), "short-term benchmarks" (explicitly "for short-term loans"), and "loan guarantees" (explicitly "for loans guaranteed or ensured under this program"). None of the questions in those sections were applicable to *performance guarantees* that were tied to a sale transaction (like the guarantee received by SeAH) and not to a loan.

>    2.   *Defendant's Proposed Interpretation Is*
>         *Contrary to Commerce's Actual Determination*
>         *and to the Language of the Questionnaire*

Defendant argues that SeAH was nevertheless required to provide information on KEXIM Performance Guarantees that were outstanding during the investigation period because Commerce's questionnaire indicated that the KEXIM Performance Guarantee would be "classified" as a loan guarantee.[19] But that argument is a *post hoc* rationalization that is directly contrary to Commerce's actual determination, and cannot be reconciled with the actual language of the questionnaire.

Commerce's decision to apply AFA to SeAH was not based on the instructions set forth in the "Loan Appendix" or any purported "classification" of the KEXIM-Performance-Guarantee program as a loan guarantee. Instead, Commerce's Final Determination held that SeAH had been required to report the KEXIM Performance Guarantee it received in 2019 because Commerce had requested information on performance guarantees received during the investigation period (based on the language of

---

[18] *See id*. at 24 (emphasis added).

[19] *See* Defendant's Brief at 15-16.

its question for the program), and also over the 15-year average-useful life period (based on the "other subsidies" section of its questionnaire).[20]

Furthermore, Defendant's *post hoc* rationalization is contrary to Commerce's actual decision.  In its Final Determination, Commerce did not treat the KEXIM Performance Guarantee that SeAH received in 2019 as a loan guarantee.  Instead, Commerce indicated it had to evaluate the performance guarantee provided by KEXIM based on the specific form of the guarantee.[21]  And, Commerce determined that the performance guarantee SeAH obtained from KEXIM was comparable to export insurance, not a loan guarantee.[22]  In such circumstances, Defendant's attempt to supply an explanation that is contrary to Commerce's decision must be rejected by this Court.[23]

Finally, Defendant's argument has no support in the actual language of the questionnaire.  The "Loan Appendix" did not indicate that guarantees that were not tied to loans should nevertheless be "classified" as "loan guarantees."  Instead, it specifically indicated that information on "loan guarantees" was required only for guarantees provided in connection with loans.[24]

---

[20] *See* I&D Memo at 70-71 (PR-377).

[21] *See id*. at 74.

[22] *See id*. at 10 (selecting the K-SURE Export Credit Guarantee program as the AFA rate for the KEXIM Performance Guarantee that SeAH obtained because "both programs are export-specific guarantee programs").

[23] *See e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (explaining that the court may not accept "post hoc rationalizations for agency action" and may only sustain the agency's decision "on the same basis articulated in the order by the agency itself").

[24] *See* pages 7-8 above.

Commerce's description of KEXIM Performance Guarantees in its questionnaire explicitly envisioned that such guarantees might be provided for sales transactions between a seller and a buyer (as the performance guarantee received by SeAH in 2019 was), and not in connection with loans.[25]  Consequently, the fact that Commerce's "Loan Appendix" requested information on guarantees relating to loans that remained outstanding during the investigation period did not mean that Commerce also requested information on guarantees relating to other types of transactions that remained outstanding but had not been received during the period.

Significantly, for other programs investigated by Commerce for which the assistance could have been provided as a loan or loan guarantee, Commerce not only requested the completion of the "Loan Appendix" but explicitly stated that respondents were required to report information on anything provided or that remained outstanding during the investigation period regardless of the form of the assistance.[26]  SeAH could not have been

---

[25] The description of the program in the "Initiation Checklist:" included in the questionnaire stated that:

> The petitioners allege that KEXIM provides Performance Guarantees that guarantee the obligor's performance under the eligible contracts such that, "in the event the obligor fails to perform its obligation, {KEXIM} makes payment to the sponsor(s) *or buyer(s)* upon their demand for payment of the guaranteed amount on valid grounds." The petitioners state that the Performance Guarantees may take the form of a bid bond, advance payment bond, performance bond, or retention bond....

*See* Initial Questionnaire, Initiation Checklist, at 13 (PR-129) (emphasis added).

[26] *See e.g.*, *id*. Section III at 9 (requesting a response to the "Loan Appendix" for the KDB Short-Term Discounted Loans for Export Receivables program and specifying that the "response should provide details regarding all short-term discounted loans provided to your company, *or outstanding, during the POI whether in the form of loans, negotiation fees, etc.*").

on notice that Commerce was requesting information on "outstanding" KEXIM

Performance Guarantees when Commerce failed to include similar instructions for the

KEXIM-Performance-Guarantee program in its initial questionnaire.[27]

Overall, then, the questionnaire indicated that:  (1) the KEXIM Performance

Guarantees under investigation might include transactions other than loans, (2) for

guarantees that were related to loans, information was required for guarantees received or

outstanding during the period; and (3) for guarantees that were *not* related to loans,

information was only required for guarantees received during the period.  In fact, this

understanding of the question was shared by the other mandatory respondent in the

investigation.[28]  And that respondent was not subjected to AFA for reading the

questionnaire in the same manner as SeAH.

> 3.  *Contrary to Defendant's Claim, Commerce's Initial Questionnaire Did Not Instruct SeAH to Report "Benefits" Received During the Investigation Period*

Defendant also claims that Commerce's request that SeAH report "assistance"

received during the investigation period meant that outstanding guarantees that were not

received during the period had to be reported.[29]  It appears that Defendant means to

suggest that any program that provided a countervailable "benefit" during the investigation

---

[27] *See e.g.*, *Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804, *12-*13 (1999) (finding that, where Commerce had failed to request information "specifically," it had failed to provide plaintiff with sufficient notice under 19 U.S.C. § 1677m(d)).

[28] *See* Hyundai Steel Company's January 11, 2022, Initial Questionnaire Response for Hyundai HYSCO at 13 (limiting its response for the KEXIM-Performance-Guarantee program to those tied to loans outstanding during the investigation period) (PR-209, CR-165).

[29] *See* Defendant's Brief at 15-16.

period provided "assistance" during the period.[30]  But Commerce's questionnaire did not

ask about "benefits" received from the program during the investigation period.[31]  And as

Defendant admits, Commerce itself did not conclude that its request to report "assistance"

received during the period was defined as "benefits" received during the period.[32]

More generally, Defendant's proposed interpretation is contrary to Commerce's

established practice.  According to Commerce's past decisions, guarantees, including those

that remain outstanding, are considered to have been "received" during the year the "terms

were agreed upon."[33]  As a result, Commerce's actual request for information in its initial

questionnaire did not require SeAH to report guarantees that were agreed upon before the

investigation period but remained outstanding during the period.

Furthermore, even if one could legitimately interpret Commerce's questionnaire as

requiring SeAH to report any KEXIM Performance Guarantees for which "benefits" were

received during the investigation period, there is no basis for finding that SeAH's response

was inadequate.  In this case, Commerce explicitly found that the performance guarantee

that SeAH received from KEXIM in 2019 was akin to export insurance.[34]  Under

Commerce's regulations, the "benefit" from export insurance is considered received in the

---

[30] *See id*. (citing 19 C.F.R. § 351.506(b)).

[31] *See* Initial Questionnaire, Section III at 8 (emphasis added) (PR-129).

[32] *See* Defendant's Brief at 15-16.  *See also Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*, 222 F. Supp. 3d 1255, 1267 (CIT 2017) (ignoring the Government's "effort to prop up Commerce's determination" with *post hoc* rationale).

[33] *Final Affirmative Countervailing Duty Determination; Oil Country Tubular Goods from Spain*, 49 Fed. Reg. 47060, 47061-62 (Nov. 30, 1994).

[34] *See* note 22 above.

year that the insurance provider makes a payment.[35]  Since KEXIM did not make any

payments under the terms of the performance guarantee during the 2020 calendar year,

there was no benefit to SeAH during the investigation period to be reported.[36]

> B.  *Defendant's Argument that Information on KEXIM*
>     *Performance Guarantees Received Prior to the Investigation*
>     *Period Must Be Reported as an "Other Subsidy" is Unfounded*

Defendant also contends that, even if the KEXIM-Performance-Guarantee question in

the initial questionnaire was limited to guarantees received during the investigation period,

SeAH was nevertheless required to report any KEXIM Performance Guarantees it received

prior to the investigation period in response to Commerce's request to disclose any "other

subsidies" the company received during the average-useful-life period.[37]  However, as

explained in our initial brief, that position is contrary to the plain language of Commerce's

questionnaire, Commerce's past determinations, and decisions by this Court which confirm

that the "other subsidies" question in Commerce's questionnaire in countervailing duty

cases only requires respondents to report any *other programs* not specifically alleged in the

petition or questionnaire.[38]  Since Commerce has admitted that the performance guarantee

received by SeAH falls under the KEXIM-Performance-Guarantee program alleged and

---

[35] *See Final Determination In the Countervailing Duty Investigation of Large Residential Washers from the Republic of Korea*, 77 Fed. Reg. 75975 (Dec. 26, 2012), and accompanying I&D Memo at 14 (explaining that the timing of when the "benefit" from the K-SURE Export Credit Guarantee program is received is based on 19 C.F.R. § 351.520).

[36] *See e.g.*, *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1573 (Fed. Cir. 1990) (explaining that when the answer to Commerce's question is no, such a response is complete and further explanation from the respondent is unnecessary).

[37] *See* Defendant's Brief at 16-17.

[38] *See* SeAH's Initial Brief at 34-37.

specifically addressed in Commerce's questionnaire, the request for information in the "other subsidies" section of the questionnaire does not apply.[39]

Furthermore, none of the legal authorities that Defendant cites support Commerce's position that the "other subsidies" question may be used by the agency to mandate additional information on programs specifically identified in the questionnaire.  First, the language quoted by Defendant comes from this Court's decision in *Guizhou Tyre v. U.S.*[40] In that case, the Court specifically explained that the request for information in the "other subsidies" section of Commerce's questionnaire is for programs *not alleged in the petition or investigated by Commerce*.[41]  In addition, the *Allegheny* case concerned the statutory requirement for Commerce to investigate *unalleged* subsidy programs "discovered" during the proceeding pursuant to 19 U.S.C. § 1677d.[42]  Since, the KEXIM Performance Guarantee program was alleged and included in Commerce's questionnaire, the request for information in the "other subsidies" section of Commerce's questionnaire and 19 U.S.C. § 1677d are inapplicable to the KEXIM Performance Guarantee obtained by SeAH.

However, it should be noted that if Commerce were to consider the performance guarantee that SeAH received from KEXIM in 2019 as a new subsidy that was "discovered" during the course of the investigation pursuant to 19 U.S.C. § 1677d, its regulations require Commerce to actually investigate the program and make a determination whether the program constitutes a countervailable subsidy, regardless of

---

[39] *See id*. at 36.

[40] *See Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1335 (CIT 2021) (citing *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d at 1150 n. 12).

[41] *See id*. at 1331 and 1340-41.

[42] *See Allegheny Ludlum Corp. v. United States*, 24 C.I.T. 452, 460-61 (2000).

how late in the proceeding the program was "discovered."[43]  Commerce did not undertake

any such investigation.  If it had, it would have found that (as SeAH demonstrated at

verification) the performance guarantee SeAH obtained from KEXIM in 2019 related to a

contract for the sale of non-subject merchandise to a third-country market.[44]  That

information would be sufficient to establish that the guarantee received by SeAH from

KEXIM did not constitute a countervailable subsidy under the statute and Commerce's

regulations.[45]  In these circumstances, Commerce's refusal to consider that information

and its decision to impose an AFA subsidy rate for the KEXIM Performance Guarantee

that SeAH received in 2019 is inconsistent with the requirements of the statute.

>   C.   *Defendant-Intervenor's Claim that SeAH Failed*
>        *to Supply a Requested Financial Statement in a*
>        *Timely Manner Is a Post Hoc Rationalization*
>        *that Is Unsupported by Record Evidence*

For its part, Defendant-Intervenor argues that Commerce correctly found that SeAH

did not provide requested information because a copy of SeAH's 2018-2019 audited

financial statements, which was included in the materials presented at verification to

demonstrate "non-use" of the KEXIM-Performance-Guarantee program, was not provided

in response to the request in Commerce's initial questionnaire to submit SeAH's financial

---

[43] *See* 19 C.F.R. § 351.311(b) (explaining that the Secretary will either "examine the… program if the Secretary concludes that sufficient time remains before the scheduled date for the final determination" or if there is insufficient time remaining, allow the petition to be resubmitted with the new program alleged or defer consideration until the subsequent administrative review).

[44] *See* Verification Report at 10 (PR-345, CR-265).

[45] 19 C.F.R. § 351.524(b)(1)-(2) (explaining that "any "subsidy" that is tied to a particular market or product will be attributed to that market or product).

statements for the last three fiscal years.[46]  As a result, Defendant-Intervenor suggests that

Commerce properly rejected the 2018-2019 financial statements as an untimely

questionnaire response.  However, Defendant-Intervenor's argument is of no consequence,

because Commerce did not find that SeAH's response to that question in its questionnaire

deficient.  Instead, Commerce rejected the material presented at verification on the theory

that it was an untimely response to the Department's question on the KEXIM-

Performance-Guarantee program in its initial questionnaire.[47]  In these circumstances,

Defendant-Intervenor's argument is irrelevant to Commerce's determination that is at issue

in this appeal and an impermissible *post hoc* rationalization that must be rejected by the

Court.[48]

It should also be noted that Defendant-Intervenors' assertion that SeAH was required

to submit its 2018-2019 financial statements is unsupported by the record.  Commerce's

initial questionnaire stated the following:

> Please provide your company's complete audited financial statements
> for the last three fiscal years… The financial statements should include
> the complete set of statements, *e.g.*, income statement, balance sheet,
> cash flow statement, statement of change in equity, all notes thereto,
> and the auditor's opinion.[49]

Contrary to Defendant-Intervenor's suggestion, nothing in the questionnaire required

SeAH to provide every iteration of audited financial statements for the relevant period.

Instead, SeAH was only required to provide complete copies of its audited financial

statements that covered the last three fiscal years.  SeAH's submission of complete copies

---

[46] *See* Defendant-Intervenor's Brief at 6-7.

[47] *See* I&D Memo at 6 and 70 (PR-377).

[48] *See* notes 23 and 32 above.

[49] Initial Questionnaire, Section III at 4 (PR-129).

of its 2018 financial statements and its 2019-2020 financial statements was, therefore, fully responsive to the Department's request for information.

    D.   *Commerce's Rejection of the Materials Presented at Verification Was Unlawful*

As explained in SeAH's initial brief, Commerce's verification agenda stated that information "*will be accepted at verification… when information is requested by the verifiers*, in accordance with the agenda below, to corroborate, support, and clarify factual information already on the record."[50]  Furthermore, Commerce's verification agenda specifically requested SeAH to "*provide all appropriate source records* to substantiate the completeness and accuracy of the information in the responses" for the KEXIM-Performance-Guarantee program.[51]  The information provided by SeAH demonstrating "non-use" of the KEXIM-Performance-Guarantee program fell squarely within that request.  As a result, Commerce was not permitted to reject that information as untimely.

Neither Defendant nor Defendant-Intervenor have any real response on this issue. Defendant does suggest that rejection of the materials was consistent with the instructions set forth in Commerce's verification agenda because the materials presented at verification did not "corroborate, support, or clarify" the information SeAH reported in its initial questionnaire response.[52]  But that claim is absurd.  The statement in SeAH's questionnaire response was that it "did not have any performance guarantees from KEXIM for loans that were outstanding during the investigation period."[53]  And, as explained in SeAH's initial

---

[50] SeAH Verification Agenda at 6-7 (PR-332) (emphasis added).

[51] *Id*. (emphasis added).

[52] *See* Defendant's Brief at 11.

[53] *See* SeAH's January 10, 2022, Response at 27 (PR-168, CR-136).

brief, the materials presented at verification for the KEXIM-Performance-Guarantee program fully corroborated that statement.[54]

In short, the information provided by SeAH at verification was fully responsive to Commerce's request that it substantiate its response regarding the KEXIM Performance Guarantee. Having opened the door to such evidence, Commerce was in no position to object that the information presented by SeAH to corroborate its response also happened to demonstrate the existence and terms of an earlier (and, in SeAH's view, irrelevant) guarantee.[55]

    E.    *Commerce's Determination that Application of Facts Available with an Adverse Inference Was Warranted Due to SeAH's Alleged Failure to Act to the Best of Its Ability Was Unsupported by Substantial Evidence and Contrary to Law*

In its Final Determination, Commerce stated that application of AFA to SeAH was appropriate because SeAH did not act to the best of its ability when it did not provide information regarding the KEXIM Performance Guarantee it received in 2019 in its initial questionnaire response.[56] Defendant asserts that Commerce's conclusion was correct because Commerce's verification report shows that "SeAH failed to respond to Commerce's initial questionnaire completely and fully by the deadline" and that SeAH improperly replaced its own judgment for that of Commerce.[57] As a result, Defendant asserts that SeAH failed to cooperate to the best of its ability in providing information requested by the agency "even though such information was in SeAH's control at the time

---

[54] *See* SeAH's Initial Brief at 23-27.

[55] *See JSW Steel Ltd. v. United States*, 315 F. Supp. 3d 1379, 1382-3 (CIT 2018).

[56] *See* I&D Memo at 6 (PR-377).

[57] Defendant's Brief at 20.

the information was requested and SeAH had the ability to report such information."[58] Defendant's assertions, however, are not supported by the record and mischaracterize the relevant legal standard.

As explained at length above and in our initial brief, Commerce *never* requested information on KEXIM Performance Guarantees received prior to the investigation period. SeAH's response to Commerce's request for information was complete and accurate.  As a result, the assertion that AFA was appropriate because SeAH did not act to the best of its ability to supply requested information is not supported by the record.

Nothing in the cases relied on by Defendant support reaching a different result.[59]  In the *Essar Steel* case, the Court confirmed that "*Commerce* must ensure that respondents are fully aware of what information the Department seeks and the form in which it seeks the data and that failure to do so can render the decision 'unsupported by substantial evidence and otherwise contrary to law.'"[60]  In the *Hyundai* and *POSCO* cases*, the Court explained that applying AFA to respondents is appropriate when the respondents did not respond to Commerce's "specific and comprehensive" requests for information.[61]  And in the *Guizhou Tyre* case, the Court confirmed that the "other subsidies" section of Commerce's questionnaire requires respondents to report information on any *unalleged*

---

[58] *Id*.

[59] *See* Defendant's Brief at 21-22.

[60] *Essar Steel Ltd. v. United States*, 34 C.I.T. 1057, 1072 (2010) (quoting *SKF USA Inc. v. United States*, 29 CIT 969, 978, 391 F.Supp.2d 1327, 1335–36 (2005)).

[61] *Hyundai Heavy Indus., Co. v. United States*, 399 F. Supp. 3d 1305, 1312 (CIT 2019), aff'd, 819 F. App'x 937 (Fed. Cir. 2020).  *See also POSCO v. United States*, 353 F. Supp. 3d 1357, 1375 (CIT 2018) (finding that the respondent did not provide requested information because Commerce broadly asked to report "any subsidies").

program not included in Commerce's questionnaire that respondents may have used during the average-useful-life period.[62]

    This Court has held that, when Commerce does not request information on a specific program in its questionnaire, the proposition that the respondent exercised its "discretion to determine what information Commerce needed for the investigation…. {is} misplaced."[63] The Court has also held that, even when new information is provided during verification that was not included in a respondent's questionnaire response, Commerce may not conclude that the new information was "withheld" and apply AFA if that information was never "requested" by Commerce in its questionnaires.  The Court explained that in such a situation:

> Commerce must point to something on the record to support its determination, under § 1677e(a), that in fact {the respondent} withheld requested information. Adverse inferences are not record evidence. A desire to punish untimely corrections is not record evidence. Without substantial evidence that requested information was withheld, Commerce {is} not permitted to supplement the record with facts available under § 1677e(a). Consequently, Commerce {is} also not permitted to use AFA under § 1677e(b).[64]

In light of the record of this case, the statute, and this Court's past decisions, Commerce's application of AFA to SeAH for its alleged failure to supply "requested" information on the KEXIM-Performance-Guarantee program cannot be sustained and must be remanded for reconsideration.

---

[62] *See Guizhou Tyre*, 523 F. Supp. 3d at 1340–41.

[63] *JSW Steel*, 315 F. Supp. 3d at 1383.

[64] *Id*. at 1384.

> **F.** *Commerce Did Not Satisfy its Statutory Burden to Provide an Opportunity to Correct Deficiencies in Reported Information Before Applying Facts Available to SeAH*

Finally, even if SeAH's initial response had not provided information requested by Commerce's initial questionnaire, the statute required Commerce to provide SeAH an opportunity to remedy the deficiency before resorting to facts available.[65]  Defendant asserts that this statutory requirement is inapplicable for three reasons:  (1) Commerce could not have been aware of the deficiency in SeAH's initial questionnaire response; (2) SeAH should have sought clarification from Commerce regarding the scope of Commerce's information request; and (3) Commerce's request for information in its initial questionnaire provided SeAH sufficient opportunity to provide information on the KEXIM-Performance-Guarantee program.[66]  But none of the justifications have merit.

> **1.** *Commerce Is the Only Party that Knew the Information it Needed and Could Have Requested Additional Information on the Program*

Defendant argues that SeAH must have first notified Commerce that it had received a performance guarantee from KEXIM in 2019 in order for Commerce to be "aware… that SeAH's reporting was incomplete" and that supplemental information was needed.[67]

---

[65] *See* 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d).

[66] For its part, Defendant-Intervenor argues Commerce could not have known that SeAH's response for the KEXIM-Performance-Guarantee program was deficient because SeAH's 2018-2019 financial statements, which identified that SeAH had received a guarantee from KEXIM in 2019, were not submitted prior to verification.  *See* Defendant-Intervenor's Brief at 12-15.  Our response to Defendant-Intervenor's arguments about the 2018-19 financial statements is set forth above, at pages 15-17 above.

[67] Defendant's Brief at 18.

Defendant's argument is absurd, and would improperly excuse Commerce of its responsibilities as the expert and fact-finder in these proceedings.[68]

As mentioned, SeAH's response to Commerce's initial questionnaire concerning the KEXIM-Performance-Guarantee program stated that "SeAH… did not have any performance guarantees from KEXIM *for loans that were outstanding during the investigation period*."[69]   Commerce was, therefore, on notice that SeAH had not made any representations with respect to guarantees that were not tied to loans or that were received prior to the investigation period but remained outstanding during the investigation period. To the extent that Commerce had intended also to request information on such guarantees, it could and should have asked for that information in a supplemental questionnaire.

As noted in our initial brief, Commerce's supplemental questionnaires did ask for additional information on other programs when SeAH's initial response was limited to subsidies received during the investigation period, and Commerce decided that information on pre-investigation period subsidies was also required.[70]   If Commerce had intended to request information on KEXIM Performance Guarantees received before the investigation period, it could have asked for such information in its supplemental questionnaires. Commerce's failure to request that information confirms that SeAH's interpretation of the questionnaire as requesting only information on KEXIM Performance Guarantees that were received during the investigation period was correct.

---

[68] *See e.g.*, *Max Fortune Indus. Ltd. v. United States*, 36 C.I.T. 964, 971 (2012) ("Commerce is the expert fact-finder").

[69] *See* SeAH's January 10, 2022, Response at 27 (PR-168, CR-136).

[70] *See* SeAH's Initial Brief at 33.

2.   *SeAH Was Not Required to Seek Clarification*
     *from Commerce About its Request for Information*

Next, Defendant asserts that it was SeAH's responsibility to seek clarification from

Commerce in order to avoid AFA.[71]  However, contrary to Defendant's claim, this Court

has made clear that the statute "does not place that obligation on the submitter.  To avoid

the threat of § 1677e(b), a submitter need only provide complete answers to the questions

presented in an information request."[72]

In this case, Commerce's initial questionnaire only requested information about

KEXIM Performance Guarantees received by SeAH during the 2020 investigation period.

In response, SeAH reasonably provided information on guarantees received during 2020,

of which there were none.  The fact that Commerce seems subsequently to have decided

that its questionnaire should have requested information on other guarantees received

before 2020 is not SeAH's fault, and cannot justify application of AFA.

3.   *Questions in Commerce's Initial Questionnaire*
     *Do Not Satisfy the Statutory Requirement to Notify*
     *SeAH of Purported Deficiencies in Its Response*

Finally, Defendant argues that Commerce's request for information in its initial

questionnaire, based on the instructions in the "Loan Appendix" and "other subsidies"

question, "should have made SeAH aware of its obligation to report its receipt of a

performance guarantee which was still outstanding during the period of investigation."[73]

However, as explained in detail above, neither the "Loan Appendix" nor the "other

subsidies" section of the questionnaire actually requested information on KEXIM

---

[71] *See* Defendant's Brief at 22.

[72] *Olympic Adhesives*, 899 F.2d at 1574.

[73] *See* Defendant's Brief at 21-22.

performance guarantees that were not tied to loans and that were received before the investigation period.  And, even if they had, a request for information in the initial questionnaire does not satisfy the statutory requirement that Commerce must provide an opportunity for respondents to correct any deficiencies in their initial reporting before Commerce may resort to facts available.

CONCLUSION

Defendant and Defendant-Intervenor failed to demonstrate that SeAH did not provide "requested" information for the KEXIM-Performance-Guarantee program.  As a result, Commerce's actions were not consistent with the evidence on the record or with the procedures required by the statute and Commerce's own regulations and practice. Accordingly, Commerce's decision to reject the information presented at verification and to apply AFA must be overturned.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Amrietha Nellan

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

June 27, 2023

CERTIFICATE OF COMPLIANCE


Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 5,986 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.


/s/Jeffrey M. Winton


June 27, 2023